Martin FREEMAN, et al.,
Appellants/Cross–
Appellees,

v.

DISTRICT OF COLUMBIA,
Appellee/Cross–
Appellant.

Nos. 10–CV–1219, 10–CV–1510, 10–
CV–1511, 11–CV–166, 11–CV–
183, 11–CV–324.

District of Columbia Court of Appeals.

Argued April 12, 2012.
Decided Nov. 15, 2012.

Anthony M. Conti, with whom Barbara E. Duvall, Baltimore, MD, was on the brief, for appellants/cross-appellees.

Holly M. Johnson, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee/cross-appellant.

Before GLICKMAN and EASTERLY, Associate Judges, and EPSTEIN, Associate Judge of the Superior Court.*

GLICKMAN, Associate Judge:

Appellants/cross-appellees, eight Metropolitan Police Department ("MPD") offi-cers,[1] brought suit in Superior Court under the District of Columbia Whistleblower Protection Act ("DCWPA").[2] Appellants' whistleblower claims arose out of their ultimately unsuccessful efforts to secure off-duty employment as security guards at the then newly opened Gallery Place mall in downtown Washington, D.C. Appellants needed to obtain the MPD's permission to engage in such off-duty work. The MPD granted this permission to about half of the officers, but in the end, Gallery Place contracted directly with the MPD to provide officers to staff a security detail there. Appellants complained to the Chief of Police and the Mayor that the MPD had acted illegally in obtaining the contract for itself and thereby depriving them of the lucrative mall security employment. In their lawsuit, appellants alleged that the MPD and then Commander (now Chief of Police) Cathy Lanier violated the DCWPA by disciplining or threatening to discipline them in retaliation for their protected disclosure of the MPD's illegal conduct.

The trial court granted summary judgment for the District against five of the eight plaintiffs and allowed the whistleblower claims of the remaining three, Officers Freeman, Fowler, and McLaughlin, to proceed to trial against the District. The jury found for McLaughlin and awarded him $12,665 in back pay and non-economic

---

* Sitting by designation pursuant to D.C.Code § 11-707(a) (2001).

1. In the proceedings below, there were nine plaintiff officers, one of whom chose not to pursue the present appeal. The eight officers now before us are Officers Martin Freeman, Duane Fowler, Sean McLaughlin, Billy Robin, Robert Grooms, Theodore Anderson, Antonio Williams, and Hilliard Dean. For ease of reference, this opinion will refer to appellants/cross-appellees as "appellants," or by their individual names, and to appellee/cross-appellant, the District of Columbia, as "the District."

2. D.C.Code §§ 1-615.51-.59 (2006 Repl.). Subsequent to the events at issue in this appeal, the DCWPA was amended in certain respects by D.C. Law 18-117, 57 D.C.Reg. 896 (March 11, 2010), the "Whistleblower Protection Amendment Act of 2009." The changes in the law, though significant, are not pertinent to the issues before us, and unless otherwise stated, all statutory references in this opinion are to the statute in force when appellants' claims arose.

damages, but found against Freeman and Fowler on the grounds that the MPD took disciplinary action against them for "legitimate, independent reasons." The court denied the District's post-trial motion for judgment on McLaughlin's claim notwithstanding the verdict and awarded attorney's fees to McLaughlin as a prevailing party.

The officers appealed, and the District cross-appealed. Appellants contend that the trial court erred in disposing of the whistleblower claims of Officers Robin, Groom, Anderson, Williams, and Dean on summary judgment and in dismissing Commander Lanier as a defendant in the litigation. In addition, appellants challenge several of the court's rulings during trial. For its part, the District argues that the trial court should have granted its post-trial motion for judgment as a matter of law because McLaughlin (the only plaintiff who prevailed at trial) lacked a reasonable basis for believing that the MPD had engaged in the putatively illegal conduct of which it had been accused.

We agree with the District that McLaughlin failed as a matter of law to establish a valid claim under the DCWPA. The District therefore was entitled to judgment notwithstanding the jury's verdict in McLaughlin's favor. In all other respects, we uphold the challenged rulings of the trial court. Consequently, we vacate the judgment for McLaughlin and remand for entry of judgment for the District.

## I. Factual Background of Appellants' Lawsuit

### A. The Opening of an Investigation into Unauthorized Off–Duty Employment and "Brokering"

In October 2004, Officers Martin Freeman, Duane Fowler, Sean McLaughlin, and Billy Robin submitted to their supervisor, Sergeant Raymond Chambers, the forms required to request authorization to perform compensated off-duty security guard work at the Gallery Place mall. Chambers signed off on the requests and forwarded the applications, which are referred to as "PD 180 packages," to Commander Lanier's administrative lieutenant, Ralph Ennis. The applications were not granted, however. Lieutenant Ennis recognized some of the officers' names from an internal police investigation of unauthorized off-duty work at another site, in which it was charged that Officer Freeman had been "brokering" the outside employment. "Brokering," which occurs when a police officer "acts as an intermediary, liaison, referral agent, consultant, or third-party provider of police-related outside employment between a current or potential outside employer and any other member of the Metropolitan Police Department for the purpose of scheduling, coordinating, or any other similar activity," is illegal and grounds for termination from the police force.[3] With the pending investigation in mind, Lieutenant Ennis inquired of the Gallery Place project manager, Mark Bing–Zaremba, and learned that Freeman had been scheduling other officers to work at Gallery Place before they had obtained the required MPD authorization to do so.[4]

---

3. D.C. Law 13–160 § 302, 47 D.C.Reg. 4628–4630 (June 2, 2000)("Police Officers Outside Employment Amendment Act of 2000")(amending § 2.5 of the Metropolitan Police Department Manual). The Council decided to prohibit brokering based on its finding that the practice "presents an inherent conflict of interest." 47 D.C.Reg. 4629.

4. Police regulations specifically provide that "[m]embers shall not engage in outside employment until authorization to do so has been granted by the Chief of Police, or his or her designee...." 6 D.C.M.R. § 302.2 (2012). In the Police Officers Outside Employment Amendment Act of 2000, the Council declared that "[o]ff-duty or outside employment by

Ennis contacted Internal Affairs and initiated an investigation. Around the same time, Officers Robert Grooms, Theodore Anderson, Antonio Williams, and Hilliard Dean also submitted PD 180 packages to work at Gallery Place. Their applications were approved.

Sergeant Chambers was tasked with undertaking the initial investigation into the unauthorized off-duty work at Gallery Place. As part of that investigation, he obtained Bing–Zaremba's sworn statement that Officer Freeman had been paid "10% of payroll" to "have off-duty police work evenings at Gallery Place." Bing–Zaremba provided Chambers with an invoice from Freeman detailing the compensation due him and five other officers, including Officers Fowler, McLaughlin, and Robin, for work they had performed at the mall during the week of October 20 to 26, 2004. The invoice stated that Freeman also was owed a 10% "Security Consultant Fee." Chambers informed the four officers that they were being investigated for unauthorized work at Gallery Place and had each of them submit a sworn statement in writing. In their statements, the officers denied having worked at Gallery Place with the expectation of receiving payment; Officer Freeman stated that he had "volunteered" security services there.

Chambers completed his investigation on November 23, 2004. He concluded in his report that Freeman, Fowler,

McLaughlin, and Robin had engaged in unauthorized off-duty work; that Freeman had engaged in brokering; and that all of the officers had responded untruthfully to his inquiries. The report eventually reached Commander Lanier's desk, and on December 14, 2004, she signed off on it. Two days later, on December 16, a cover letter was attached to the report and it was forwarded up the chain of command.

## B. The MPD Provides Gallery Place with a Reimbursable Detail, and Appellants Complain

The day before Chambers completed his investigation, on November 22, 2004, the MPD started providing Gallery Place with security services via a "reimbursable detail" of police officers working overtime. In a reimbursable detail, because the officers are on-duty, the security work is coordinated and supervised by the MPD. The MPD pays the officers, and the private party reimburses the MPD at a fixed rate.[5] At trial, Bing–Zaremba explained that he had contacted the MPD and spoken to Commander Thomas McGuire to arrange for the reimbursable detail because he had been dissatisfied with the off-duty services that Gallery Place had been receiving. Commander McGuire confirmed Bing–Zaremba's testimony.

Freeman testified that Bing–Zaremba had told him a different story, however. According to Freeman, Bing–Zaremba

members of the Metropolitan Police Department in private businesses requires strict regulation to prevent conflicts of interest and to ensure that off-duty or outside employment does not interfere with the members' performance of their police duties." 47 D.C.Reg. 4629.

5. *See* D.C.Code § 47–2820(b) (2005 Repl.), which provides, *inter alia*, that:

when, in the opinion of the Chief of Police ... it is necessary to post policemen ... at, on, and about the licensed premises for the protection of the public safety, ... [the

owner or manager of the licensed premises] shall pay a ... monthly permit fee, to be determined monthly by the said Chief of Police ... based upon a reasonable estimate of the number of hours to be spent by policemen ... at, on, and about the licensed premises, this fee to be payable in advance on the first day of the month for which the permit is sought. Policemen ... so assigned shall be charged for by the hour at the basic daily wage rate of policemen ... so assigned in effect the first day of the month for which the permit is sought.

said he was "getting a little antsy" because it was taking so long for the officers to be approved for off-duty work at Gallery Place, and the MPD had approached him to propose an alternative. Freeman learned that "Commander McGuire and Chief [Brian] Jordan at different times told [Bing–Zaremba] that it was in his best interest for him to hire [a reimbursable detail] instead of using ... the police officers" and warned Bing–Zaremba that the off-duty officers were "not going to get approved" to work for him.

Freeman surmised that "the whole purpose of delaying the paperwork [the PD 180 packages] had nothing to do with [the brokering] investigation," but was a "stall tactic" to "force Mark Bing–Zaremba to choose the department at a higher rate." Ostensibly on the basis of this belief, the officers complained to their union, the Fraternal Order of Police ("FOP"). On December 14, 2004, an attorney retained by the union sent a letter addressed to the Mayor and the Claims Bureau in the District of Columbia Office of Risk Management, with copies to the Chief of Police and the Chair of the Committee on the Judiciary of the D.C. Council. The letter asserted a class action claim against the District of Columbia for monetary damages in excess of $15 million on behalf of "certain members" (Freeman being the only member identified) who allegedly had been "harmed" by the MPD's establishment of the reimbursable detail at Gallery Place and "countless others similarly situated." The letter charged that:

> [i]nstead of processing the [PD 180 packages for officers who wanted to work at Gallery Place], which normally occurs over the course of a few days, the MPD engaged in tortious conduct designed to prevent the officers from securing the off-duty contracts, while at the same time, pressuring the Gallery Place to retain the MPD to provide the services through the use of overtime officers.[6]

The MPD's actions, the letter claimed, "violate[d] the regulations governing the private employment of officers," specifically the prohibition against brokering outside employment, and tortiously interfered with the officers' "contractual relationships and prospective economic advantages."[7] On December 16, 2004, Freeman and the union chairman disclosed the contents of the letter on a local evening news television broadcast (FOX–5).

## C. Subsequent Action on the Investigative Report and Imposition of Discipline

After Commander Lanier approved Sergeant Chambers's investigative report on

**6.** The factual allegations offered in support of this general conclusion do not include the claim made by Freeman at trial that MPD officials told Bing–Zaremba the PD 180 packages would not be approved. The letter stated only that MPD officials contacted Bing–Zaremba and informed him "that he should not use the MPD's off-duty officers, but should instead retain the services of the department and use its detail officers"; "that it was in his best interest to retain the MPD and use detail officers"; and that the MPD could make that more cost-effective. The letter went on to assert—inaccurately, as discussed *infra*—that the commanding officer had not approved any of the officers' applications to perform off-duty work at Gallery Place. The letter acknowledged that the MPD's stated reason for the delay in granting approval was that "the commanding officer would not be signing off until they completed and [sic] investigation on Officer Freeman." The letter did not claim this reason was false or illegal.

**7.** The letter added that although it was not written on behalf of "the private businesses that have been adversely affected by the MPD's practices, ... the prohibition against the MPD soliciting and brokering private overtime security work is designed to prevent situations involving coercion and the exploitation of private businesses in the District."

December 14, the report was submitted to Assistant Chief William Ponton, the head of the MPD's Office of Professional Responsibility. Ponton reviewed the report; "made a number of notes that [he] put into a memorandum[;] and sent the investigation and those notes to the internal affairs division[, directing] them to review the investigation, conduct any additional investigation that might be necessary and to address the comments that [he] had made." Ponton also provided internal affairs with a copy of the December 14, 2004, letter from the attorney for the FOP complaining about the establishment of a reimbursable detail at Gallery Place. At trial Ponton explained that, in light of that letter, he considered it preferable to bring in the internal affairs division to conduct the follow-up investigation rather than "sending it back to the same chain of command to have the same people" do so.

In his transmittal memorandum to the internal affairs division, Ponton commented that, while "the invoice [furnished by Freeman to Bing–Zaremba] included as proof of employment may be sufficient to sustain an adverse action ...", the best evidence in this case would be copies of the check issued as payment or a record clearly indicating the checks were issued and payment was made." Ponton therefore suggested that Gallery Place be asked to "provide actual proof of payment in order to provide stronger grounds to support the untruthful statements charges." Sergeant Anthony Langley, the internal affairs officer assigned to the investigation, met with Bing–Zaremba, who confirmed that he had sent Freeman a check in response to the invoice. Langley did not obtain the cancelled check itself, but he did get a copy of Gallery Place's records documenting its payment to Freeman on December 22,

2004, of the amount requested in the invoice.

After completing his work, Langley prepared a supplemental memorandum with additional exhibits to append to Sergeant Chambers's original report. Langley also inserted a paragraph summarizing his supplemental investigation in Chambers's report and added his new exhibits to Chambers's original list of attachments. Asked at trial about Langley's alteration of Chambers's report, Ponton testified that the "insertion of this paragraph, as stupid as it is ... has no bearing on the facts that were contained in either investigative report."

The final report of the investigation submitted by Sergeant Langley was reviewed and approved by his superiors. Inspector Glenn Shearod submitted the report to Assistant Chief for Human Services Shannon Cockett with the recommendation that Officers Fowler, McLaughlin, and Robin be suspended for twenty-five days and that Officer Freeman be terminated from the police force. Assistant Chief Cockett approved the recommended suspensions. A three-member adverse action panel held an evidentiary hearing on Freeman's proposed discipline in September 2005 and agreed with the recommendation that his employment be terminated. Assistant Chief Cockett accepted that recommendation.

## II. Discussion

### A. The District of Columbia Whistleblower Protection Act

 The DCWPA "provides a specific, burden-shifting structure for the litigation of whistleblower claims[, which] is likewise the standard by which a summary judgment disposition must be reviewed." [8]

---

8. *Johnson v. District of Columbia,* 935 A.2d 1113, 1117–18 (D.C.2007). *See* D.C.Code

First, a District government employee must prove by a preponderance of the evidence "[1] that [he or she] made a protected disclosure, [2] that a supervisor retaliated or took or threatened to take a prohibited personnel action against [him or her], and [3] that [his or her] protected disclosure was a contributing factor to the retaliation or prohibited personnel action."[9] In pertinent part, for purposes of the present case, a "protected disclosure" means:

> any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences ... [a]buse of authority in connection with the administration of a public program ... [or a] violation of federal, state, or local law, rule or regulation.... [10]

The eligibility of a disclosure for protection under the DCWPA thus "hinges not upon whether the [conduct] was ultimately determined to be illegal, but whether appellant reasonably believed it was illegal."[11] The term "prohibited personnel action" includes a termination or suspension of an employee for making a protect-ed disclosure.[12] If the plaintiff makes the requisite showing, the burden shifts to the District to "prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in [protected] activities."[13] In construing the DCWPA, we have found it helpful to consider how its federal counterpart, 5 U.S.C. § 2302(b)(8)(B) (2008), and similar state whistleblower laws have been interpreted.[14]

### B. Summary Judgment

The trial court granted the District's motion for summary judgment on the whistleblower claims of Officers Robin, Dean, Anderson, Williams, and Grooms.[15] Preliminarily, the motion required the court to determine what could have constituted a "protected disclosure" in this case. The court found that only the December 14, 2004, letter sent on appellants' behalf by their union attorney could serve as a protected disclosure. The FOX–5 broadcast two days later did not constitute a protected disclosure because it was not made to a "supervisor or a public body" as the DCWPA then required.[16] And be-

§§ 1–615.53–.54(b) (2006 Repl.).

9. *Wilburn v. District of Columbia*, 957 A.2d 921, 924 (D.C.2008) (citing *Crawford v. District of Columbia*, 891 A.2d 216, 218–19 (D.C. 2006)).

10. D.C.Code § 1–615.52(a)(6) (2006 Repl.). The definition of a "protected disclosure" was substantively revised by the Whistleblower Protection Amendment Act of 2009. *See supra* note 2.

11. *Zirkle v. District of Columbia*, 830 A.2d 1250, 1260 (D.C.2003).

12. *See* D.C.Code § 1–615.52(a)(5)(2006 Repl.).

13. *Id.* § 1–615.54(b) (2006 Repl.).

14. *See Wilburn*, 957 A.2d at 925; *see also Crawford*, 891 A.2d at 221 n. 12 ("There is no evidence in the record indicating that the D.C. Council intended to apply a different liability standard in its whistleblower cases than that applied in all other federal and state whistleblower laws of which the court is aware.").

15. The court also granted the District summary judgment against the FOP, which had joined as a plaintiff in the action. Although the FOP has appealed this ruling, it was plainly correct: Not being an "employee," *see* D.C.Code § 1–615.52(a)(3) (2006 Repl.), the FOP has no cause of action under the DCWPA. *See id.* § 1–615.54(a) (2006 Repl.).

16. *See* D.C.Code § 1–615.52(a)(6) (2006 Repl.). We note that the Whistleblower Protection Amendment Act of 2009 relaxed this

cause the broadcast disclosed the substance of the allegations to the public, the broadcast "thereby foreclose[d] future protected disclosures regarding the same topic." [17] As to the December 14 letter itself, the court found that appellants made a potentially protected disclosure in alleging that the MPD had acted illegally and contrary to applicable regulations when it offered its own detail to Gallery Place while delaying the processing of the officers' PD 180 applications to perform off-duty work there. Appellants do not challenge these threshold rulings; they attack the court's summary judgment determinations on other grounds, grounds that vary depending on the affected individual.

For its part, the District does not argue on appeal that the December 14 letter fails to disclose information evidencing the MPD's use of illegal strong-arm tactics to coerce Gallery Place into accepting and paying for a reimbursable detail. We therefore assume without deciding that the letter contains sufficient factual allegations of undue coercion, vague and conclusory though the allegations are, to qualify as a potentially protected disclosure.[18] Apart from any such allegations of strong-arm tactics, though, we agree that the December 14 letter would not have passed muster as a protected disclosure. In particular, the letter's claim that the statutory prohibition of brokering forbade MPD officials from arranging to provide a reim-

bursable detail to Gallery Place is plainly without merit. The statutory prohibition applies only to private brokering of off-duty employment and does not prohibit the MPD from offering to provide or providing a reimbursable detail. In fact, D.C.Code § 47–2820(b) explicitly authorizes the Chief of Police to provide such details on private property.[19]

In evaluating the trial court's findings and appellants' contentions, we follow well-established rules. Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[20] "In determining whether summary judgment was warranted, we assess the record independently ... [and view it] in the light most favorable to the party opposing the motion." [21]

### 1. Officer Robin

The court granted summary judgment against Robin because it found that he "had no belief, much less a reasonable belief, regarding the legality or the propriety of MPD's actions until after the FOX–5 broadcast on December 16, 2004." This determination was based on Robin's admissions in his deposition testimony that he did not learn about possible extortion by the MPD until he met with the FOP *after* the broadcast had occurred. Relying

---

requirement. *See* D.C.Code § 1–615.52(a)(6) (Supp.2012).

17. *See Wilburn,* 957 A.2d at 925 (" 'A disclosure of information that is publicly known is not a disclosure under the WPA,' whose purpose 'is to protect employees who possess knowledge of wrongdoing that is concealed ... and who step forward to help uncover and disclose that information.' " (quoting *Meuwissen v. Dep't of Interior,* 234 F.3d 9, 13 (Fed.Cir.2000))).

18. *See supra* note 6.

19. *See supra* note 5.

20. Super. Ct. Civ. R. 56(c). "The requisite showing of a genuine issue for trial is predicated upon the existence of a legal theory [that] remains viable under the asserted version of the facts." *Lee v. Jones,* 632 A.2d 113, 115 (D.C.1993) (internal quotation marks omitted).

21. *Wilburn,* 957 A.2d at 924 (internal quotation marks omitted).

on *Zirkle v. District of Columbia,*[22] Robin nonetheless argues that "[t]he trial court's decision is completely at odds with its conclusion that Freeman, Fowler, and McLaughlin had a reasonable belief because the plaintiffs all relied upon the same 'essential facts known to and readily ascertainable' by them."[23]

■ Robin misses the crucial point. The dispositive question in his case is not *whether* he had a belief (reasonable or otherwise), but *when* he arrived at it. The definition of a "protected disclosure" uses the present tense: A protected disclosure is one "that the employee reasonably believes evidences" abuse of authority, violation of law, or other specified wrongdoing.[24] The DCWPA thereby makes clear that an employee must have had such a belief *at the time the whistle was blown* in order to state a claim under the DCWPA. A contrary reading would border on absurdity, as the Act could not have been intended to encourage employees to make allegations of official misconduct without actually believing them, on the mere possibility that sufficient grounds will turn up after the fact. That, however, is the flaw in Robin's position, for he admittedly did not even become aware that the MPD's actions might have been illegal until after the whistle was blown. Consequently, even if it is true that the December 14 letter was written on behalf of Robin as well as the other officers, the letter was not *his* "protected disclosure" because, at the time, he lacked the belief necessary to make it one. For that reason, we hold that the trial court correctly granted summary judgment to the District on Robin's whistleblower claim.[25]

## 2. Officers Dean, Anderson, and Williams

■ The trial court granted summary judgment against Dean, Anderson, and Williams because they were never disciplined or threatened with discipline and, therefore could not demonstrate that they suffered a prohibited personnel action as a result of their alleged protected disclosure. To meet their burden of proof in this regard, the three officers claimed to have heard around the police department that superior officers were threatening to discipline officers who were involved in sending the December 14 letter. The court concluded that this was inadmissible hearsay and that the officers "offer[ed] no admissible evidence" that they were threatened with retaliation.[26]

---

**22.** 830 A.2d 1250 (D.C.2003).

**23.** Brief for Appellants at 12 (quoting *Zirkle,* 830 A.2d at 1259–60). As we explain below in discussing whether McLaughlin had a reasonable belief in the illegality of the MPD's actions, appellants misapprehend the test we adopted in *Zirkle* for determining whether an employee's belief in allegations of official misconduct was reasonable. Contrary to appellants' position, information that an employee did not have cannot make his belief a reasonable one, even if the information would have been "readily ascertainable" by the employee.

**24.** D.C.Code § 1–615.52(a)(6) (2006 Repl.).

**25.** That said, we also note that our reasons for concluding that McLaughlin lacked a reasonable belief in the alleged misconduct, which we discuss below, are equally applicable to Robin.

**26.** Appellants also claimed that a statement made by Captain Bryant as he addressed his unit constituted a threat. Bryant testified that he:

> told them about the outside employment. We have to deal with that on our unit. But we're still a team and I still respect everybody the same like I always do. It's not up to me to judge you. If you do something everybody is their own man, if you did something wrong and you got to suffer for it, take you [sic] medicine like a man and keep going but I won't view you any different.

■ We affirm the trial court's ruling that Dean, Anderson, and Williams did not meet their burden of proof under the DCWPA. No exception to the rule against hearsay would allow the jury to consider for their truth statements by unidentified officers about threats of discipline made by unidentified supervisors. A proffer of inadmissible hearsay cannot defeat a motion for summary judgment.[27]

We also are not persuaded by appellants' argument that they suffered retaliation other than disciplinary action.[28] This argument fails because the additional alleged "retaliation"—that as a result of the installation of the reimbursable detail, the three officers (along with Officer Grooms) were "deprived of the opportunity to work the Gallery Place off-duty detail after having been approved for the off-duty work" [29] —occurred *before* the whistleblowing took place. Indeed, it was this deprivation that was the subject of the December 14 letter. The MPD could not have retaliated against appellants for disclosures that had not yet been made.

### 3. Officer Grooms

■ In 2007, some two-and-a-half years after the Gallery Place events, the MPD initiated disciplinary proceedings against Grooms based on criminal charges of domestic violence filed against him in Maryland. The criminal charges eventually were dropped, and the MPD adverse action panel ultimately found insufficient cause to terminate Grooms. No adverse action was taken against him. In this litigation, however, Grooms asserted that the proposed disciplinary action was in retaliation for the December 14, 2004, letter.[30] The trial court granted summary judgment for the District on Grooms's claim, reasoning that the proposed discipline in 2007 was "too attenuated [in time] to serve as evidence that it was in retaliation for any whistleblowing in 2004" and that "[n]o reasonable jury could find otherwise." [31]

■ We agree with the trial court's conclusion that Grooms failed to make a *prima facie* case of a DCWPA violation. There is no evidence of a causal connection between any whistleblowing on his part in December 2004, and the institution of a disciplinary proceeding with respect to the criminal charges he faced in 2007. We held in *Johnson v. District of Columbia* that while the temporal proximity of an

---

The trial court held it "unreasonable as a matter of law to construe Bryant's statement as a threat of discipline based on whistleblowing." We agree. But even if Bryant did convey a threat of discipline, that threat never materialized for Dean, Anderson, and Williams. As they suffered no injury, they demonstrated no entitlement to relief.

27. *Boulton v. Inst. of Int'l Educ.*, 808 A.2d 499, 502 (D.C.2002). *See also* Super. Ct. Civ. R. 56(e).

28. *See* D.C.Code § 1–615.52(a)(5) (2006 Repl.)(" 'Prohibited personnel action' includes ... retaliating in any other manner against an employee because that employee makes a protected disclosure. . . . ").

29. Brief for Appellants at 17.

30. *See* D.C.Code § 1–615.52(a)(5)(2006 Repl.)(" 'Prohibited personnel action' includes ... recommended, threatened, or actual termination. . . . ").

31. Grooms attempted to argue that the 2007 disciplinary action was retaliatory because it was instituted shortly after Assistant Chief Cockett was served with a deposition notice in this case, but that claim was shown to be factually incorrect. The 2007 deposition notices were served on the District's attorney, who managed to have the depositions cancelled. Cockett was not deposed until February 2009, at which time she testified that she had not been told about the 2007 notices and had not known that Grooms was a party to this case. Her testimony was unrefuted.

adverse personnel action to a protected disclosure may lend support to an inference of a causal relationship, "a stretch of [over two years] realistically cannot constitute temporal proximity in the ordinary sense of that phrase." [32] Furthermore, "an inference of retaliation cannot rest solely on 'temporal proximity' (even if it is established) where the opportunity for retaliation conflicts with the opponent's explicit evidence of an innocent explanation of the event." [33] Thus, even if Grooms could overcome the hurdle of the two-and-a-half-year gap, he still did not make out a *prima facie* case in light of the District's "explicit evidence of an innocent explanation of the event"—namely, that an internal proceeding was warranted because criminal allegations of assault had been made against Grooms. The District was entitled to summary judgment on Grooms's whistleblower claim under *Johnson.*

## C. Dismissal of Commander Lanier as a Defendant

■ Appellants named Commander Lanier as a defendant only in her official capacity. An official-capacity suit against a municipal official "is *not* a suit against the official personally," but rather is a suit

against the municipality.[34] As municipalities can be sued directly for damages and other relief, "[t]here is no longer a need to bring official-capacity actions against local government officials." [35] Thus, because the suit against Lanier was "in reality a suit against the District of Columbia," [36] which also was named as a party-defendant, it was superfluous to name Lanier. The court therefore did not err in granting the District's motion to dismiss her from the action or in subsequently denying appellants' requests for relief against her pursuant to D.C.Code § 1–615.55.[37] Had appellants wanted to pursue claims against Lanier, it was incumbent upon them to seek leave to amend their complaint to sue her personally. Their failure to request leave to amend dooms their appeal of Lanier's removal from the case.

## D. Trial Rulings

■ Appellants challenge a number of rulings at trial relating to the admission or exclusion of evidence and similar matters. Our review is for abuse of discretion.[38]

### 1. Admission in Evidence of the Report of the Adverse Action Panel

The ultimate decision to terminate Freeman's employment was made by Assistant

**32.** 935 A.2d 1113, 1120 (D.C.2007) (rejecting inference of causation where four months elapsed between the alleged whistleblowing and the allegedly retaliatory internal police investigation).

**33.** *Id.*

**34.** *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

**35.** *Id.* at 167 n. 14, 105 S.Ct. 3099.

**36.** *Thomas v. District of Columbia,* 942 A.2d 1154, 1157 n. 2 (D.C.2008) (internal quotation marks omitted); *cf.* Super. Ct. Civ. R. 25(d)(1) (when a public officer sued in his official capacity ceases to hold office, his successor is automatically substituted).

**37.** The version of the statute in effect when appellants' claims arose provided that "any supervisor" found to have violated the DCWPA "shall be subject to" a civil fine and appropriate disciplinary action. In this regard, it should be noted that the trial court found that appellants failed to present sufficient evidence at trial to show that Lanier knew of the December 14 letter before she took action against any of them. We need not address this alternative ground for dismissing her from the case.

**38.** *See, e.g., Walker v. United States,* 929 A.2d 873, 880 (D.C.2007).

Chief Cockett. She based her decision entirely on the written report and recommendation of the adverse action panel of three MPD officials that had held an evidentiary hearing on the charges against Freeman. The District offered the report in evidence at trial as proof that Cockett was not motivated by a desire to retaliate against Freeman for whistleblowing and that she would have made the same decision regardless of the whistleblowing. Appellants objected, arguing that the report was a "one-sided view of days and days of testimony" and that it "would be unfairly prejudicial." In overruling those objections and allowing the District to introduce the report to show the basis for Freeman's termination, the trial court stated that appellants were free to call witnesses who testified before the adverse action panel and examine them regarding their testimony. Appellants never sought to call such witnesses, nor did they offer the hearing transcript in evidence to rebut the adverse action report.

■ We perceive no abuse of discretion in the court's ruling. The adverse action report was highly probative of an important aspect of the District's defense, and appellants made no showing that the danger of unfair prejudice substantially outweighed its probative value.[39] For the first time on appeal, appellants argue that the report was inadmissible hearsay. This

claim was not preserved for our review, but, in any event, it is without merit because the report was not admitted for the truth of the matters asserted in it and therefore was not hearsay. The report was admitted solely to establish the non-retaliatory basis for Cockett's decision to terminate Freeman.[40]

### 2. Exclusion of Captain Bryant's Testimony

■ The trial court sustained the District's objection to testimony from Captain Bryant (Freeman, Fowler, and McLaughlin's commanding officer) that he believed the investigation into the Gallery Place situation was "tainted" as a result of Sergeant Langley's interpolations in Sergeant Chambers's investigative report. The court found that Bryant's opinion to that effect would not be based on personal knowledge and therefore would not be helpful to the jury. As Bryant was not offered as an expert witness, this ruling was not an abuse of the court's discretion. "Modern rules of evidence permit nonexpert witnesses to express opinions as long as those opinions are based on the witness' own observation of events and are helpful to the jury."[41] Bryant had been away from the MPD when Chambers conducted his investigation and submitted his report. In Bryant's absence, one of his

**39.** *See Johnson v. United States,* 683 A.2d 1087, 1099–100 (D.C.1996) (en banc)(adopting as part of the common law of the District Federal Rule of Evidence 403, including its "requirement that the danger of unfair prejudice substantially outweigh probative value before relevant evidence may be excluded").

**40.** *See, e.g., Jones v. United States,* 17 A.3d 628, 632 (D.C.2011) ("Statements that are not offered at trial to prove the truth of the matter asserted are not hearsay."). Appellants also object on appeal to certain comments about Freeman made by the adverse action panel in its report, such as its statement that Freeman

"chose to slander the Department" in the media and its characterizations of him as "an untrustworthy employee," "a liar," and "a rogue officer." But appellants did not bring these comments to the trial court's attention or ask that the report be redacted (conceivably because they viewed the comments as helpful to prove their claim of retaliation). We cannot fault the court for failing to do what it was not asked to do.

**41.** *Carter v. United States,* 614 A.2d 913, 919 (D.C.1992) (internal quotation marks omitted).

lieutenants signed the report on his behalf before forwarding it on to Commander Lanier. Although Bryant "looked through" the report upon his return, he did not review it "in detail because it was already completed." At his deposition, Bryant testified that he learned about Langley's alteration of the investigative report only after appellants brought the instant action. Consequently, Bryant only formed his opinion after the investigation and the actions it precipitated were over, and his opinion was not based on first-hand knowledge of how the report was altered.

### 3. Exclusion of a December 2004 Arbitration Decision

In support of their argument that the discipline of Freeman, Fowler, and McLaughlin was pretextual, appellants sought to introduce in evidence an arbitration decision concerning unauthorized off-duty employment that had been rendered in December 2004 in another, factually unrelated case. Appellants claimed that the decision showed the MPD knew it had to prove the officers' actual receipt of compensation in order to sustain a charge of unauthorized off-duty employment. The trial court excluded this arbitration decision as irrelevant.

 We are not persuaded the trial court erred or that appellants were prejudiced if it did. In the first place, although the officers denied having been paid by Gallery Place, and Sergeant Langley failed to obtain Gallery Place's cancelled check, there was ample other evidence that pay-

ment was made. This evidence included Freeman's invoice,[42] Gallery Place's internal business record of having paid it, and Bing–Zaremba's testimony. Furthermore, the regulations requiring police officers to obtain prior authorization to engage in outside employment define "outside employment" to mean "the engagement in any line of business or the performance at any time *for the purpose of obtaining wages, salary, fee, gift, or other compensation,* of any work or service of any kind for any person, firm, or corporation other than that required by one's official position in the Metropolitan Police Department." [43] Thus, actual receipt of compensation need not be shown to prove a violation of the regulations if there is evidence that the officer intended or expected to be paid. We do not understand the December 2004 arbitration decision to hold otherwise.[44]

In any event, at trial, the only MPD official who testified to having known of the December 2004 arbitration decision was Assistant Chief Cockett. She learned of it when Fowler and McLaughlin submitted it to her in support of their administrative appeal of their suspension. Cockett testified that she read the decision and that the "gist" of it was that "there needed to be compensation for outside employment." She understood that this simply meant there needed to be evidence from which it could be inferred an officer was paid for off-duty work and that proof of an "expectation of future compensation" would suffice. Consequently, Cockett explained, in deciding to suspend Fowler and McLaughlin, she simply did not view the

---

42. Freeman testified that the invoice was only a "mock" document he had created to show Gallery Place how much less costly it would be to hire off-duty officers than a reimbursable detail.

43. 6 D.C.M.R. § A300.1 (2012) (emphasis added).

44. In that case, the officer claimed that he had provided his services for free to a close friend, and the MPD presented no evidence to prove otherwise.

lack of an actual cancelled check to be exculpating. The arbitration decision would have been probative only if it contradicted Cockett's testimony, which it did not. The trial court therefore acted within the ambit of its discretion to exclude the decision as not relevant.[45]

### 4. Exclusion of Evidence Pertaining to the Delay in Processing Appellants' Applications for Authorization to Work Off–Duty at Gallery Place

■ Appellants also argue that the trial court erred in denying, on relevancy grounds, their motion to admit a 2009 decision by a Public Employee Relations Board ("PERB") hearing officer. Appellants claim the decision was relevant because it held that the MPD was prohibited by its collective bargaining agreement from considering pending charges of misconduct in evaluating an officer's request for outside employment, as the MPD did in delaying action on Freeman, Fowler, and McLaughlin's requests to work at Gallery Place because of complaints about their unauthorized off-duty work and brokering activity at another site. We disagree. Appellants misread the hearing officer's decision; it specifically acknowledged the propriety of considering pending charges of misconduct so long as those charges relate to outside employment, which is exactly what occurred here. Accordingly, we agree with the trial court that the hearing officer's 2009 decision was irrelevant to the issues in this case.

### 5. Denial of Spoliation Relief

Appellants' last objection to trial rulings is to the court's denial of their request for spoliation relief, i.e., a missing evidence instruction or permission to argue a missing evidence inference. Appellants requested such relief on account of the District's loss of certain documents, primarily the original signed copy of Sergeant Chambers's investigation report and the original request from Gallery Place for a reimbursable detail.

■ On the record before us, we perceive no error. "The doctrine of what has been termed spoliation of evidence includes two sub-categories of behavior: the deliberate destruction of evidence and the simple failure to preserve evidence."[46] "When the loss or destruction of evidence is not intentional or reckless, ... the issue is not strictly 'spoliation' but rather a failure to preserve evidence," and the trial court "has discretion to withhold the issue from the jury after considering factors such as the degree of negligence or bad faith involved, the importance of the evidence lost to the issues at hand, and the availability of other proof enabling the party deprived of the evidence to make the same point."[47] Thus, absent "a finding of gross indifference to or reckless disregard for the relevance of the evidence to a possible claim," we have held that "a refusal to instruct on missing evidence is not error unless we can say that the trial court, in all of the circumstances, abused its discretion."[48]

---

45. See Reavis v. United States, 395 A.2d 75, 78 (D.C.1978) ("Relevance, and the concepts it embodies, determines initially whether a proffered item of evidence will be admissible.").

46. Battocchi v. Wash. Hosp. Ctr., 581 A.2d 759, 765 (D.C.1990).

47. Id. at 766–67.

48. Id. at 767; see also id. at 765 ("[O]ur decisions leave a trial court broad discretion on whether to give or withhold an instruction that inherently risks 'creating evidence from nonevidence.'" (quoting Stager v. Schneider, 494 A.2d 1307, 1313 (D.C.1985))); id. at 766 ("[A]t least where the failure to preserve evidence is merely negligent, 'nothing in the decisions of this jurisdiction requires that

In the present case, the trial court found that appellants had produced no evidence that the District's loss of the requested evidence was attributable to deliberate misconduct, recklessness, or even ordinary negligence. Appellants point to no facts in the record that persuade us this finding was erroneous. Furthermore, appellants articulate no persuasive reason why the loss of the documents harmed their case; the fact that the investigation report had been altered (by Sergeant Langley's insertions) was shown through other evidence, and if anything, the loss of Gallery Place's request for a reimbursable detail simply prejudiced the District in its ability to present its defense. We thus have no basis on which to say the trial court abused its discretion in denying appellants' request for spoliation relief.

### E. Judgment Notwithstanding the Verdict

The District argues that it was entitled to judgment as a matter of law on McLaughlin's whistleblower claim, notwithstanding the jury verdict in his favor, because McLaughlin lacked reason to believe the factual allegations of illegality set forth in the December 14 letter and therefore could not have made a "protected disclosure" within the meaning of the DCWPA. We agree with the District's contention.

■■ Whether the evidence in this case was sufficient to go to the jury is a question of law subject to *de novo* review on appeal.[49] "[J]udgment notwithstanding the verdict is appropriate only ... where no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party."[50] However, a defendant is entitled to judgment as a matter of law when the plaintiff "fails to establish an essential element of his case on which he bears the burden of proof."[51]

At trial, McLaughlin acknowledged that Lieutenant Ennis informed him that his and other officers' applications for authorization to work off-duty at Gallery Place were being held up because of the pending investigation into their violation of the regulations governing outside employment. Thereafter, McLaughlin testified, he "heard" that the MPD had told Gallery Place it would need to hire a reimbursable detail rather than off-duty officers:

> There came a time where I learned that the reason the [*sic*] our paperwork was being held up ... was that Chief Jordan and Commander, I think his name is McGuire, was talking to, I believe either Bing–Zaremba or whomever they needed to talk to at Gallery Place. And they were telling them that they need to hire the police department, because they're not going to get us because our paperwork is not going to be approved; and if they don't hire the police department, they're not going to get any police officers. And, when I heard that, I was like, that's illegal, they cannot do that, what are they doing?

But when McLaughlin was asked to "[e]xplain ... why [he] thought what was going on was illegal," he did not identify the supposed *coercion* of Gallery Place as the problem. Rather, he testified, it was

sanctions be automatically imposed.' " (quoting *Cotton v. United States*, 388 A.2d 865, 870 (D.C.1978))).

49. *See WMATA v. Jeanty*, 718 A.2d 172, 174 (D.C.1998).

50. *Lyons v. Barrazotto*, 667 A.2d 314, 320 (D.C.1995) (internal quotation marks omitted).

51. *Varner v. District of Columbia*, 891 A.2d 260, 265 (D.C.2006).

the mere fact that the MPD had *solicited* Gallery Place that he thought constituted the illegality because, in his fifteen years' experience,. "the department gets reimbursable details by people calling the department, asking can they provide security, ... [b]ut for the department to go solicit it was unheard of, and I'm like, this is ... illegal, I know it's illegal." McLaughlin could offer no other reason at trial for considering solicitation by the MPD to be illegal—he just kept saying that he "knew it was." Furthermore, he admittedly did not "ask[ ] around ... to find out whether or not [a reimbursable detail] had ever been requested." Nonetheless, he found the alleged behavior on the part of the MPD in soliciting Gallery Place to be "shocking," and he was "furious." "So," he testified, "I went down to the union, along with some other officers, and I expressed my feelings about it, and that generated this [the December 14] letter."

When McLaughlin was asked on cross-examination *how* he learned of the MPD's supposed solicitation of Gallery Place, he was unable to recall. Asked specifically whether he had heard about it from Freeman, McLaughlin said he was "not sure who [he] obtained [the information] from." Further questioning revealed that McLaughlin similarly could not recall the basis for any belief that the MPD had strong-armed Gallery Place into accepting a reimbursable detail:

Q: Officer McLaughlin, you said that you obtained your information that the department had ... strong-armed this reimbursable detail, that you were told that by someone.

A: I didn't say I was told that.

Q: Well, you found out about it somehow.

A: First, my own feelings on what was going on and my experience on the job, that had never happened before, never.

———

Q: The reason that you believe that that happened was because of this strong arming by police officials.

A: Yes, sir.

Q: And you obtained that information, the strong arming information, that was told to you by someone, right?

A: Well, it was—it was all going on, it was a process. It was a process.

Q: You figured it out for yourself?

A: Well, it was—it was blatant; what else could it be?

Q: You heard Assistant Chief Jordan and Commander McGuire tell the people at Gallery Place.

A: No, sir.

Q: You had to obtain that information from someplace.

A: It was—I don't know who I obtained it from, but I did hear about that, yes, sir, about them going down and talk[ing] to Mr. Bing–Zaremba.

Q: You heard it around the office, rumors?

A: I'm not sure where I heard it, but I did hear it, exactly how it was going down and what went down.

McLaughlin never claimed to have had first-hand knowledge of what took place between the MPD and Gallery Place; nor did he claim to have been informed of what took place by any of the direct participants or anyone else who had knowledge of, or who had investigated, the circumstances. No other witness testified to having informed McLaughlin of the factual basis for the allegations in the December 14 letter. Moreover, McLaughlin admittedly undertook no inquiry to verify the "shocking" story he had heard—he did not, for exam-

ple, ask the officer in charge of managing reimbursable details or his supervisors how the detail at Gallery Place had been arranged. The most the jury had before it, therefore, was McLaughlin's assertion that an unidentified source of unknown reliability told him about the alleged misconduct and that he took what he was told at face value and believed it.[52]

In denying the District's motion for judgment notwithstanding the verdict, the trial court held that the jury could find McLaughlin's belief to have been reasonable based on information unknown to but reasonably ascertainable by him at the time. For the reasons that follow, we disagree with that rationale.

As previously stated, a "protected disclosure" means a "disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that *the employee reasonably believes* evidences ... [a]buse of authority ... [or a] violation of federal, state, or local law, rule or regulations" or other misconduct.[53] And as we have discussed above in connection with Robin's appeal from the court's summary judgment ruling, the plaintiff personally must have had such a belief at the time the disclosure was made.

Preliminarily, it is debatable whether McLaughlin should be deemed to have made a disclosure at all, protected or otherwise. McLaughlin was not the source of any of the allegations of wrongdoing in the December 14 letter, nor did he verify them, corroborate them, or contribute to them in any other way. The letter did not even mention McLaughlin's name. It ap-

pears the sole source of the allegations—the one person who actually made a disclosure of information purportedly showing wrongdoing—was Freeman, who claimed to have learned about the MPD's solicitation and coercion of Gallery Place from Bing–Zaremba. In authorizing the attorney retained by the FOP to seek monetary damages on his behalf, McLaughlin simply was riding on Freeman's coattails.

The District, however, has not argued that McLaughlin could not have been a whistleblower because he bore no responsibility for any of the disclosures in the December 14 letter. Assuming *arguendo* that McLaughlin can be credited with having made the allegations in that letter, his burden at trial was to establish not just his subjective belief that the information set forth evidenced official misconduct, but also the objective reasonableness with which he held that belief. To determine whether a plaintiff's belief was objectively reasonable for purposes of the DCWPA, we adopted, in *Zirkle v. District of Columbia*,[54] the test articulated by the Federal Circuit for use in applying the federal whistleblower statute—the so-called "disinterested observer test":

Could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence [illegality]? A purely subjective perspective of an employee is not sufficient even if shared by other employees. The WPA is not a weapon in arguments of policy

52. McLaughlin asserted that his belief was confirmed when he learned that a reimbursable detail actually had been assigned to Gallery Place. But the mere fact that a detail existed did nothing to corroborate McLaughlin's belief that the MPD had strong-armed Gallery Place into accepting the detail.

53. D.C.Code § 1–615.52(6) (2006 Repl.)(emphasis added).

54. 830 A.2d 1250 (D.C.2003).

or a shield for insubordinate conduct.[55]

The phrasing of this test—in particular, its reference to facts "readily ascertainable" by the employee—has been the source of some confusion. Contrary to appellants' assertion, the test does not mean an employee can be found to have had a reasonable belief in official wrongdoing based on facts he did not know so long as he "readily" could have ascertained them. Neither the DCWPA nor its federal counterpart was enacted to encourage employees to make allegations of misconduct without knowing whether the facts support them. They do not institute a lottery scheme under which would-be whistleblowers receive protection for making unsupported accusations if they happen to be lucky and, for reasons unknown to them, the accusations turn out to be supportable after all. Rumor and suspicion do not provide an objectively reasonable foundation for an accusation of illegal government conduct.[56] The mere fact that corroborating information is "readily ascertainable" by the employee does not make his own personal belief any more reasonable or any less of an unsubstantiated rumor.

As we read the Federal Circuit's opinion in *Lachance*, it included the reference to readily ascertainable facts in setting forth the disinterested observer test not to protect rumor-mongering, but to underscore that the test requires consideration of "all the evidence presented, including that which detracts from a 'reasonable belief.'"[57] In other words, the fact finder must consider whether the employee reasonably should have been aware of information that would have *defeated* his inference of official misconduct. Willful or inexcusable blindness is not consistent with a reasonable belief. An employee cannot attain whistleblower status by dispensing with due diligence and remaining unjustifiably ignorant of information that would have refuted or cast doubt on his charges.

Could a disinterested observer reasonably have believed that "the essential facts known to and readily ascertainable by" McLaughlin constituted evidence of illegal governmental conduct? McLaughlin testified that he believed that any solicitation of Gallery Place by the MPD was illegal. His stated basis was that he did not believe the MPD ever before had solicited a private property owner to use a reimbursable detail. Even if that was so, however, that fact does not mean, or support a reasonable belief, that the solicitation was illegal. In fact, the MPD has authority under D.C. law to encourage private property owners to use reimbursable details as an alternative to private security guards or off-duty police officers. D.C.Code § 47–2820(b) explicitly authorizes the Chief of Police to provide details "for the protection of the public safety" on private property, and to charge a fee for doing so.[58] MPD's right to provide details for the public safety includes the right to solicit private entities to accept them; the MPD

**55.** *Id.* at 1259–60 (quoting *Lachance v. White,* 174 F.3d 1378, 1381 (Fed.Cir.1999)).

**56.** *See, e.g., Pedeleose v. Dep't of Defense,* 343 Fed.Appx. 605, 609 (Fed.Cir.2009)(holding that belief in "highly suspect" information based on "nothing more than highly attenuated gossip" did not satisfy the disinterested observer test); *Tex. Dep't of Crim. Justice v. Terrell,* 18 S.W.3d 272, 277 (Tex.App.2000) (holding that whistleblowing employee failed to present evidence that his belief in wrongdoing was reasonable, where he relied "entirely on unsubstantiated rumor and innuendo").

**57.** *Lachance,* 174 F.3d at 1381 (quoting *Frederick v. Department of Justice,* 73 F.3d 349, 353 (Fed.Cir.1996)).

**58.** *See supra* note 5.

is not required to wait passively for a private property owner to approach it if the MPD has a concern that the owner has not provided adequately for security. McLaughlin offered no evidence that made it reasonable for him to believe that it would have been unlawful for the MPD to have broached the subject with Gallery Place.

As we have noted, however, the District concedes (perhaps improvidently) that the December 14 letter charged the MPD not only with solicitation, but with having abused its authority or otherwise violated the law by coercing Gallery Place into contracting for a reimbursable detail. Although, at trial, McLaughlin identified solicitation rather than strong-arming as the illegal conduct on which he blew the whistle, he did testify to his belief that MPD officials refused to approve his and other officers' applications to work at Gallery Place off-duty and told Bing–Zaremba that if Gallery Place did not hire the police department, it would not get "any police officers" at all. We therefore assess that belief under the disinterested observer test.

■■■ Usually, the question in a whistleblower case is whether the facts alleged in the disclosure reasonably evidenced illegality; here, in view of the District's concession and its principal argument on appeal, we must focus on whether McLaughlin even knew enough to make it reasonable for him to place credence in those alleged facts. If not, his whistleblower claim cannot succeed, for an employee who does not reasonably believe in the truth of the material facts on which he relies cannot reasonably believe that those facts evidence

abuse of authority, a violation of law, or other governmental misconduct.[59] Although this court has not had occasion before now to apply the disinterested observer test to assess whether a plaintiff reasonably believed his factual allegations (as opposed to whether those allegations, if credited, warranted an inference of illegality), the question in this case is not a difficult one.

To begin with, McLaughlin could not identify the source of his information that the MPD had strong-armed Gallery Place into accepting a reimbursable detail. He could say only that he heard it from someone, and he did nothing to verify it. But as we have discussed, mere rumor does not furnish a reasonable basis for a charge of official wrongdoing, and "[a] purely subjective perspective of an employee is not sufficient even if shared by other employees." [60]

It might be argued that a jury reasonably could find that the source of McLaughlin's belief in the MPD's wrongdoing must have been Freeman, who reported that Bing–Zaremba told him MPD officials had given Gallery Place the Hobson's choice of paying for a reimbursable detail or having no security provided by MPD officers at all. But while we do not doubt that McLaughlin's belief derived from information that originated with Freeman, we can only speculate as to how that information was conveyed to McLaughlin—whether he received it directly from Freeman or indirectly through one or more intermediate levels of hearsay. Because the record does not show how and from whom McLaughlin acquired the information, the fact that it could be

**59.** *See Giove v. Dep't of Transp.*, 230 F.3d 1333, 1339 (Fed.Cir.2000) (upholding arbitrator's determination that employee's disclosures were not protected under federal whistleblower statute because employee did not reasonably believe the information he disseminated was true).

**60.** *Lachance*, 174 F.3d at 1381.

traced back to Freeman is not enough to establish the objective reasonableness of McLaughlin's belief in it.

Moreover, even if McLaughlin obtained his information directly from Freeman, he still lacked a reasonable basis to believe that the MPD's stated lawful reason for withholding approval of some PD 180s was pretextual and that its real purpose was to force Gallery Place to accept a reimbursable detail to meet its security needs. McLaughlin did not testify that he thought the reason was pretextual, and what he testified he believed to be illegal was solicitation, not coercion. In any event, though, the surrounding facts that McLaughlin knew or should have known belied any charge that the MPD's explanation of its actions was pretextual. McLaughlin testified that Lieutenant Ennis informed him that his and other officers' applications had not been approved because of the investigation into their noncompliance with the regulations governing off-duty work. McLaughlin had no reason to disbelieve Ennis, and he knew or should have known that the pending investigation constituted a lawful basis to withhold approval.[61] Furthermore, McLaughlin had no reason to believe the MPD had denied all the applications to work off-duty at Gallery Place; in fact, it had granted the applications of several officers who were not under investigation. The fact that the MPD had approved some officers' applications is inconsistent with the belief that the MPD sought to strong-arm Gallery Place into paying for a reimbursable detail by withholding such approvals. It also is inconsistent with any suspicion that the MPD had an improper motive in not approving McLaughlin's and a few other officers' requests for permission to work at Gallery Place. There is no evidence that MPD officials had a vendetta against any of those officers or any significant financial or other incentive to secure a reimbursable detail for the MPD at their expense.

McLaughlin also should have known that the MPD had a legitimate reason to inform Bing–Zaremba that some of the officers he anticipated hiring to furnish security had not been approved for off-duty work at Gallery Place. According to Freeman himself, Bing–Zaremba was "antsy" because Gallery Place was about to open and its security needs were not being met. Public safety would be at risk if the off-duty police officers on whom Gallery Place had planned to rely were not going to be available when the mall opened. Under D.C.Code § 47–2820(b), the MPD had a right, if not an obligation, to provide a reimbursable detail as an alternative.

■ For the foregoing reasons, we conclude that a disinterested observer could not reasonably have believed that "the essential facts known to and readily ascertainable by" McLaughlin evidenced official misconduct. Therefore, as a matter of law, we hold that McLaughlin did not shoulder his burden of proving an essential element of his DCWPA cause of action, namely, that he made a "protected disclosure." The District is entitled to judgment as a matter of law on McLaughlin's claim.

## III. Conclusion

We vacate the judgment entered against the District and remand for entry of judgment in its favor.[62] In all other respects

---

61. *See* the discussion *supra* about the 2009 PERB decision recognizing that, in reviewing PD 180 applications for outside employment, the MPD legitimately may consider pending charges of misconduct involving such employment.

62. Because McLaughlin is not a prevailing party under our decision, we also vacate the

we affirm the judgment of the Superior Court.

*So ordered.*

trial court's award of costs and attorney's fees to him under D.C.Code § 1–615.54(a) (2006 Repl.). *See Crawford v. District of Columbia,* 891 A.2d 216, 222 (D.C.2006). As none of the other plaintiffs prevailed at trial, the court properly denied their request for such relief. *See id.*