*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CV-485

NANCY JOHNSON, APPELLANT,

V.

DISTRICT OF COLUMBIA, ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-6045-12)

(Hon. Maurice A. Ross, Trial Judge)

(Argued September 17, 2019     Decided March 12, 2020)

*David A. Branch* for appellant.

*Stacy L. Anderson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General, were on the brief, for appellee.

Before FISHER, THOMPSON, and BECKWITH, *Associate Judges*.

FISHER, *Associate Judge*: Appellant Nancy Johnson filed a civil complaint challenging her termination from the Office of the Attorney General for the District of Columbia ("OAG") and now appeals the trial court's decision granting summary judgment to appellees. She claims that the trial court erred in: (1)

determining that certain communications were not protected disclosures under the District of Columbia Whistleblower Protection Act ("DCWPA"), D.C. Code §§ 1-615.51 to –.59 (2012 Repl.); (2) determining that appellant had not made a prima facie showing that any protected disclosures caused her termination; (3) finding that appellant and another employee were not similarly situated for purposes of establishing an inference of discrimination under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 to -1402.83 (2016); and (4) determining either that appellant had not established a prima facie case or had not rebutted the non-discriminatory reason given by appellees for her termination. We affirm.

## I. Background

Nancy Johnson is an African-American attorney who joined the Child Support Services Division ("CSSD") of OAG in November 2005. She was employed there until January 2012, when her termination was finalized.

As the chief of the Legal Services Section ("LSS"), Johnson reported directly to Benidia Rice and Cory Chandler, who were in turn supervised by Eugene Adams, the Chief Deputy Attorney General, and Irvin Nathan, the

Attorney General.[1]   Johnson's duties included supervising CSSD's litigation activities, reviewing pleadings prepared by line attorneys, and formulating and implementing policy in tandem with the rest of the management team.

Around June 2009, the responsibility of reviewing, signing, and filing civil contempt motions and establishment petitions[2] was transferred from Johnson's section to another CSSD section, Program Operations.  Adrianne Day, an attorney and the chief of Program Operations, began to sign the filings.  The management team also decided to automate the process by using an internal database, known by the acronym "DCCSES," to generate the motions and petitions.  During the 90-day pilot period of using the database in this way, Johnson discovered that the contempt motions sometimes included erroneous information, such as an incorrect date of issuance for support orders that CSSD was seeking to enforce.  She met with Rice and Chandler to address this issue and expressed her concerns.  Rice then asked Johnson and the Assistant Chief of LSS, Curtis Staley, to review a sampling of the filings generated by the database to see if the errors discovered were isolated incidents or indicative of a large-scale problem.  That review

---

[1]  The named defendants in this case—who are now the appellees—are the District of Columbia, Irvin Nathan, Benidia Rice, and Eugene Adams.

[2]   Establishment petitions included petitions to establish paternity and petitions to establish child support.

revealed a large-scale problem, as they found a 68% error rate in the sampling. The management team took remedial steps to address the issue.

Approximately a year later, in September 2010, a member of the Information Technology section discovered that the DCCSES system was making some additional mistakes, such as listing the wrong parents for children or providing incorrect birth dates. After learning of the issue, Johnson brought the concerns to the management team. The record does not disclose what remedial steps the management team took to address this issue.

In April 2011, a magistrate judge ordered Day to show cause why she should not be sanctioned for signing a petition to establish paternity without conducting an adequate investigation of the grounds supporting it. Though Day had signed the petition, an attorney working under Johnson's supervision in LSS had attempted to defend it in court. However, that attorney did not explain to the court that CSSD had complied with the preconditions for re-filing the case. Day maintained that the petition was properly filed, but became concerned about the risk to her license to practice law created by the unusual institutional arrangement of having motions and pleadings that she had signed being defended in court by an attorney not under her supervision. Because of this concern, Day began to refuse to sign and file the

motions that had been transferred to her section in 2009. The management team decided that her concerns were valid. Spurred by the need to shift that responsibility elsewhere, defendants decided to commence a reorganization of CSSD. As part of that reorganization, the management team decided to disband the Program Operations section and to disperse its functions across CSSD, with each remaining section receiving some new responsibilities.

At this point, the management team informed Johnson that the motions Day had been signing would be shifted to Johnson's section—a duty for which Johnson had been responsible prior to June 2009. Because Day was no longer signing and filing motions and the function could not be transferred immediately, a backlog of filings accumulated.[3] Rice recognized that cleaning up the backlog would be a burden, but emphasized to both Johnson and Assistant Chief Staley that "[i]t is fairly clear that we are in dire circumstances. CSSSD [sic] will need your support to get out of this current state of affairs." The management team offered compensatory time to attorneys who helped resolve the backlog and, as a result, the backlog was cleared in less than thirty days.

---

[3] Some of the backlog appears to be related to miscommunication during a period in which Day was not signing petitions, believing that Adams had relieved her of this responsibility, while Rice was under the impression that Day was still signing them.

After detailing her concerns, Day requested and was granted a transfer out of CSSD on June 7. She drafted a transfer memo at Rice's request, which was the second time she listed and described her duties so that the management team could prepare for transferring them elsewhere. Along with Day's petition-signing duties, the management team indicated that Johnson would inherit other functions during the reorganization. Other functions that Program Operations had previously performed were transferred to other parts of CSSD. Johnson argued that her new supervisory duties raised ethical issues, but the Chair of OAG's Ethics Committee decided that the proposed reorganization would not create an actual or potential conflict of interest. After receiving notice of that decision, Johnson raised concerns about the increased workload she would face with her additional duties.

Throughout the summer, as the management team planned and began to implement the reorganization, Johnson was asked to comment on certain proposed policies after she raised concerns about their advisability. She was also instructed to produce policies and procedures related to her duties, such as an office policy governing appropriate steps for establishing paternity. The management team repeatedly stressed that they needed Johnson's support in various transition-related tasks in order for the reorganization to be successful. Johnson completed some

tasks, often after receiving multiple prompts from other members of the management team, but did not complete others. When pressed on why she was not completing assignments, Johnson repeatedly cited her "confusion" about various policies and processes, the exact task assigned to her, or the reorganization more generally.

In the midst of growing tension between Johnson and others, especially with her direct supervisor, Rice, Johnson requested a transfer from CSSD along with a salary review. She escalated this request to AG Nathan when Deputy AG Adams did not promptly respond to multiple e-mails on the topic. She eventually met with Adams on or around September 7, 2011. On September 29, 2011, Adams informed Johnson of the proposal to terminate her. The letter to Ms. Johnson, signed by Benidia Rice, explained that "[t]his disciplinary action is being proposed because of your demonstrated failure to support the mission and goals of the Division and deliberate attempts to decrease productivity and efficiency in your section." "In your capacity as Section Chief you have displayed a serious lack of judgment and deficiency in leadership to fulfill the mission of LSS." Johnson's "responsibility was to lead the unit" during the restructuring of CSSD, "with a goal of increasing child support orders and payments," but "[s]imply put, since I first communicated the new structure to you, you have served as an obstructionist."

"CSSD has much work to do and I need you to be a team player, especially at a time when we are facing [federal] penalties because of declining numbers . . . . I have lost all confidence in your ability to lead the Legal Unit in the direction that I think we need to go in order to increase child support collections."

Attorney General Nathan made the final decision to terminate appellant Johnson. He found that Johnson "indeed failed to support the restructure [of CSSD] by your actions or inactions in a circumstance where your support was needed and reasonably expected. Because you were a manager and a person that would be instrumental in helping with the restructuring and the anticipated efficiencies that would come from it, your persistent failure to support Ms. Rice's goals for CSSD and embrace your new management responsibilities was critical." Given Johnson's varied responsibilities during her tenure as Chief of LSS, and her "involvement in the Executive Team discussions about the restructure . . . , your continued complaints that you did not understand your role or responsibility—and your continued efforts to resist these assignments—demonstrated your lack of commitment to do the work Ms. Rice needed you to do." Nathan also explained that he was "troubled with the level of disdain shown through your email communications with Ms. Rice in several of your responses. . . . After simple requests made by Ms. Rice, your reaction was immature, inappropriate and

demonstrated a desire to challenge Ms. Rice's goals as director of CSSD."[4]  This termination effectively denied Johnson's request for a transfer.

Shortly thereafter, Johnson filed this suit, claiming that her communications related to the use of the DCCSES database and the reorganization of CSSD were protected disclosures and that refusing to accommodate her request for a transfer, while terminating her instead, showed that she was treated differently than Adrianne Day because of her race.  She alleges that her termination thus violated the DCWPA and the DCHRA.

## II.    Legal Analysis

### A. Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1281 (D.C. 2002).  Evidence should be viewed in the light most favorable to the non-moving party, but "mere

---

[4]   Nathan found that it was "an open question" whether Johnson had intentionally attempted to reduce productivity and efficiency in her section.

conclusory allegations . . . are legally insufficient to avoid the entry of summary judgment." *Id.* "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We review grants of summary judgment de novo. *District of Columbia v. Place*, 892 A.2d 1108, 1110–11 (D.C. 2006).

## B. Appellant Has Not Established a Prima Facie Case Under the DCWPA

### 1. Legal Standard

The DCWPA "declares that the public interest is served when employees of the District government are free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal." D.C. Code § 1-615.51. Nevertheless, the statute is not meant to be "a weapon in arguments over policy or a shield for insubordinate conduct," *Zirkle v. District of Columbia*, 830 A.2d 1250, 1260 (D.C. 2003), and does not cover disclosures that are "minor relative to the scope of the agency's work." *Williams v. Johnson*, 776 F.3d 865, 871 (D.C. Cir. 2015) (summarizing previous decisions applying DCWPA). A purported whistleblower "must disclose such serious errors

by the agency that a conclusion the agency erred is not debatable among reasonable people." *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008).

To establish a case under the DCWPA, Johnson must show that a supervisor took, or threatened to take, "a prohibited personnel action or otherwise retaliate[d] against" her because of her "protected disclosure" or her "refusal to comply with an illegal order." D.C. Code § 1–615.53(a). Though more categories are delineated in the statute, only two kinds of protected disclosures are alleged here: "gross mismanagement" and "a violation of a . . . law, rule, or regulation." D.C. Code § 1-615.52(a)(6). Gross mismanagement consists of "a management action or inaction that creates a substantial risk of significant adverse impact on the agency's ability to accomplish its mission." *District of Columbia v. Poindexter*, 104 A.3d 848, 855 (D.C. 2014). Violations of a law, rule, or regulation must not be "merely technical or minimal" in nature. D.C. Code § 1-615.52(a)(6)(D).

Plaintiffs who allege violations of law or gross mismanagement must show that they had a reasonable and genuine contemporaneous belief that the actions they disclosed rose to the level of seriousness required under the DCWPA. *Zirkle*, 830 A.2d at 1260. This requirement is both subjective and objective; in other

words, the employee must provide evidence that she genuinely believed that the action or inaction was gross mismanagement or a violation of law, but she also must show that her belief was objectively reasonable. *See Freeman v. District of Columbia*, 60 A.3d 1131, 1151–52 (D.C. 2012). To determine if a belief is objectively reasonable, we ask whether "a disinterested observer with knowledge of the essential facts known to . . . the employee [could] reasonably conclude that the actions of the government evidence" illegality or gross mismanagement. *Zirkle*, 830 A.2d at 1259–60 (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)). To determine if the employee subjectively held such a belief, we look to "the statements in her complaint to a supervisor or to a public body, not her subsequent characterization of those statements in litigation." *Wilburn*, 957 A.2d at 925 (brackets and internal quotation marks omitted).

## 2. Purportedly Protected Disclosures

Johnson primarily argues that her communications related to the use of the DCCSES database were protected disclosures.[5] Because she points to multiple

---

[5] While Johnson's arguments in the trial court pointed to a variety of complaints as potentially protected disclosures—nineteen in total—she does not offer argument as to most of them in her appellate brief. Therefore, we focus where she centers her attention: the continued use of the automated DCCSES

(continued…)

moments in time, claiming each incident individually constituted a protected disclosure about the continued use of the DCCSES database, we address each alleged disclosure chronologically.

In 2009, CSSD decided to utilize the DCCSES database in a new way by automating the process for generating establishment petitions and civil contempt motions.[6] At this time, CSSD had maintained and utilized the DCCSES database for other functions for more than twenty years and it was passing its annual data audits. As the internal memorandum distributed to staff explained, the goal of this transition was to "improv[e] agency performance and efficiency." The management team began the transition with a two-week trial period, followed by a ninety-day pilot period, both designed "to identify any problems associated with

---

(…continued)

database to generate filings and her dissatisfaction with the related reorganization effort. Although she occasionally refers in her brief to some of these other complaints, we hold that any claims based upon them are waived. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McFarland v. George Washington Univ.*, 935 A.2d 337, 351 (D.C. 2007). "[I]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Gabramadhin v. United States*, 137 A.3d 178, 187 (D.C. 2016).

[6] Though Johnson had argued to the trial court that the 2009 decision violated the DCWPA, she now seems to concede that the initial decision to automate the process was a "debatable policy call." However, because it provides vital context for later issues with the database, we address it at some length.

the process including, but not limited to, system programming, policy or procedures." The memorandum actively solicited feedback, encouraging staff members to "[p]lease report all system problems and concerns" and creating multiple levels of review to consider responses.

As part of the management team, Johnson participated in numerous conversations about the decision to make this change. The relevant positions of the management team members are undisputed. In short, Johnson believed that the electronic system could not be as effective or accurate as more stringent attorney review; Rice would reply that "there were federal time lines and measures that needed to be met and that the Agency was moving away from paper files." Meanwhile, Day thought the processing by Johnson's unit "was inefficient and that it was slowing the process to bring these matters to Court" and had "an excessive level of review" because the cases "were not that complicated."

These conversations reflected a debate within the management team about the benefits and risks of moving to a more automated process. As Johnson stated in her deposition, she "had an overall general concern" that it was not the right decision to ramp up use of the DCCSES database. But Johnson's general concern cannot change the essential character of this decision; it was "an exercise of . . .

administrative discretion" on a "policy choice." *Zirkle*, 830 A.2d at 1258, 1260. "Mere differences of opinion between an employee and an agency supervisor as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement." *Poindexter*, 104 A.3d at 855 (brackets omitted). Johnson's concerns do not evidence a contemporaneous belief that the transition was gross mismanagement. *See Wilburn*, 957 A.2d at 926 ("In none of her communications . . . did Wilburn . . . us[e] the language of 'gross' waste or abuse, or of 'violations,' or any of the other abuses listed in section 615.52(6), or any similar language.").

Johnson's claims thus fail for at least three independent reasons: (1) she has not presented evidence that she had—and expressed—a contemporaneous belief that using the DCCSES database as part of an increasingly automated process was such a grievous error that it threatened the very mission of CSSD; (2) she has not presented evidence showing that this belief, if she had held it, would have been objectively reasonable; and (3) the issue is not appropriately classified as whistle-blowing, but was instead a question of policy that was being discussed among the management team (of which Johnson was a member).

The next instance appellant points to is the September 2010 discovery that the automated process was producing some previously undiscovered errors, such as listing incorrect birthdates for dependent children or misidentifying their parents. However, even assuming that Johnson's amplification of these issues—which were actually discovered by another employee—could qualify as whistleblowing,[7] Johnson has not demonstrated that this claim differs in any significant way from the concerns she voiced in 2009. She again presents general arguments against using the automated system—and the management team was already well aware of her displeasure with the DCCSES database—but the only change between the initial management decision and this moment in time was that an uncertain number of new errors were discovered by another person.

Viewing the evidence in the light most favorable to appellant, the crux of the conversations between appellant and other members of the management team appears to be a continuation of the same policy debate—one in which appellant "believe[d] . . . that it was worse than [she] had previously thought." But Johnson has not presented evidence that her concerns in September 2010 differed in kind from what she admits was a policy call in 2009; she merely adds additional

---

[7] *Cf. Wilburn*, 957 A.2d at 925–26 (citing cases reasoning that "disclosures" cannot already be publicly known, known to the persons the putative whistleblower reported to, or known by other supervisors).

evidence for her perspective on one side of that policy debate. Johnson also has not presented any evidence that these new errors impacted any particular court proceeding, let alone put CSSD's mission itself at risk. Because of those deficiencies, no reasonable juror could find that these errors were so grave as to make the conclusion that the agency erred to such a significant degree that its mission was threatened "non-debatable." *See Poindexter*, 104 A.3d at 856 (granting judgment notwithstanding the verdict because the management decision was "merely debatable" and "was not erroneous beyond debate") (internal quotation marks omitted).

Johnson comes closer to pointing to a particular disclosure, rather than a generalized grievance, when she implies that the show-cause order issued to Adrianne Day in April 2011 was related to the ongoing use of the DCCSES system. In that incident, Day signed a petition to establish paternity in a case that had been dismissed without prejudice in 2007. The 2007 petition, which included the same parties, was dismissed because CSSD was unable to complete the necessary genetic testing, and the court instructed CSSD to not re-file the case "until the government locate[d] the petitioner" and completed the necessary testing. Because the CSSD attorney—an attorney in Johnson's section, rather than Day's—was unable "to represent to the court that [CSSD] ha[d] complied with the

condition . . . placed upon further action," the court issued a show-cause order, asking why it should not sanction Day for violating Super. Ct. Dom. Rel. R. 11.[8] Johnson now contends that the order was "due to the inadequacy of the automated system Appellee Rice insisted on using."

However, there is no evidence that the show-cause order Day received related to any flaws in the database, let alone that Johnson contemporaneously believed there to be a relationship *and* believed that the issue exposed gross mismanagement or a violation of law. "The DCWPA . . . makes clear that an employee must have had such a belief *at the time the whistle was blown* in order to state a claim under the DCWPA." *Freeman*, 60 A.3d at 1143 (emphasis in original). Johnson's contemporaneous reaction was not to point to the database as the culprit, but rather to blame the judge who issued the order for bias and "inappropriate . . . conduct."

---

[8] Rule 11(b) states that "[b]y presenting to the court a pleading, written motion, or other paper, including an electronic filing—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies" that the motion is "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" and that "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

Johnson also never disputed the evidence in the record indicating that the petition in question *was* properly filed, and that the order instead stemmed from a lack of preparation by one of the attorneys Johnson supervised. Moreover, Johnson was not making a true disclosure when she told others about the order. The order was issued to Day, its existence was commonly known among several people within the office, and it was a matter of public record. *See Wilburn,* 957 A.2d at 925–26 ("disclosure of information that is publicly known is not a disclosure under the WPA" and "issues already known to either the persons [the plaintiff] reported to, or at least to other supervisory persons," are not disclosures). Her post hoc allegations that the use of the DCCSES database was related to this show-cause order do not, and cannot, transform her report of the show-cause order into a protected disclosure under the DCWPA.

At certain points, appellant seems to suggest that events in April 2011 bolster her claim that she was making protected disclosures in 2009 and 2010.[9] The first flaw in this claim is the previously mentioned failure to connect the show-cause orders to any error traceable to the DCCSES database. The second flaw is

---

[9] Johnson implies that the issues CSSD encountered in April 2011 with the show-cause order demonstrate that Johnson's earlier warnings were proven correct—and thus that her warnings had correctly identified the breadth and magnitude of the issues created by increased reliance on the database.

that pointing to the negative *effects* of managerial decisions does not, by itself, establish that the initial decision was gross mismanagement. We cannot review effects in isolation, but instead must look to the contemporaneous context, including the reasons for the change, whether any negative effects were foreseeable, how likely they were to occur and how harmful they were likely to be, and what other factors—such as legal necessity, expected positive results, and any need for expeditious action—may be relevant to determining whether the decision was "non-debatabl[y]" a mistake and was creating "a substantial risk . . . to the agency's . . . mission." *Poindexter*, 104 A.3d at 855. *See also Rodriguez v. District of Columbia*, 124 A.3d 134, 143–44 (D.C. 2015) (holding that alleged negative effects of investigation conducted by defendants were not dispositive of whether those actions constituted gross mismanagement, as the larger context revealed that "it would be tantamount to dereliction of duty if OAG had swept the . . . problem under the rug").

Lastly, Johnson claims that her numerous complaints about the proposed reorganization of CSSD were protected disclosures. Among other things, she alleges that her new duties would have caused her workload to be so onerous that it would have violated her ethical duties as an attorney. However, she did not make a record to show that her increased workload would violate Rule 1.3 of the D.C.

Rules of Professional Conduct or any other objective standard.[10] More generally, it is clear that Johnson's purported "disclosures" with regard to the proposed reorganization are not protected, nor are they truly disclosures. She was not disclosing anything unknown to defendants, but rather resisting the policies they had decided to promulgate. Johnson's discussions regarding these decisions are textbook examples of an employee being given an opportunity to comment on potential organizational changes; she made her comments, they were considered, and then the team finalized its decisions after taking her comments into account, though not allowing her perspective to be dispositive. The DCWPA is intended to protect employees who disclose matters of public import rather than to authorize judicial review of personnel decisions or second-guessing of administrative priorities. We conclude that none of the complaints Johnson presents on appeal can survive summary judgment under the DCWPA.[11]

---

[10] Rule 1.3(a) provides that "[a] lawyer shall represent a client zealously and diligently within the bounds of the law." Comment 1 to Rule 1.3 states that "[a] lawyer's workload should be controlled so that each matter can be handled adequately."

[11] Because of our holding that there were no protected disclosures related to the DCCSES database or the 2011 CSSD restructure, we do not reach the issue of causation on Johnson's primary arguments. However, we briefly discuss three additional events that the trial judge ruled could be protected disclosures but did not survive summary judgment because there was no proof of causation. In short, Johnson claims that she disclosed to Rice and Chandler that: (1) a contract employee presented a CSSD line attorney with a forged statement that had been

(continued…)

## C. Appellant Has Not Produced Evidence That the Reason Given for Her Termination Was a Pretext for Racial Discrimination

### 1. Legal Standard

The DCHRA has a burden-shifting framework. The employee is initially

---

(…continued)

notarized by another District employee in August 2009; (2) around March 2010 a CSSD caseworker "inappropriately executed an Acknowledgement of Paternity in a case in which she had a familial relationship"; and (3) at some point in time, Day instructed caseworkers to white-out and amend interstate petitions and to file these altered petitions with the Superior Court.

Two of those events occurred twenty-five and eighteen months, respectively, before Johnson's termination. Appellant was unable to specify a date when the third "disclosure" may have occurred. As a result, Johnson has not carried her burden to show temporal proximity that can support an inference of causation. *See Johnson v. District of Columbia*, 935 A.2d 1113, 1120 (D.C. 2007) (holding that "a stretch of four months realistically cannot constitute temporal proximity"). Johnson also has not presented any evidence from which a "pattern of antagonism" can be discerned. *See Tingling-Clemmons v. District of Columbia*, 133 A.3d 241, 247 (D.C. 2016) (a pattern of antagonism can imply a causal connection, but must occur "soon after the disclosure and continu[e] to the alleged retaliation") (internal quotation marks omitted). No reasonable jury could find that appellees were motivated by these disclosures when terminating Johnson long after the events in question, especially when Johnson has produced no evidence that any of the issues were ever mentioned in the intervening period. Given the paucity of facts in the record about these three alleged disclosures, and their lack of temporal proximity to appellant's termination, they do not create a prima facie case of a DCWPA violation.

> required to establish a prima facie case that she had been terminated because of her . . . race. If such a showing is made, the burden shifts to the employer to articulate a legitimate basis for the employee's termination. If the employer articulates a legitimate, nondiscriminatory basis for the employee's termination, the burden shifts back to the employee to demonstrate that the employer's action was pretextual. Although the burden of production may shift from the employee to the employer and back to the employee, the employee retains the ultimate burden of persuading the finder-of-fact that the employer acted with discriminatory animus.

*Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 868 (D.C. 1997).

In order to make out a prima facie case, the employee must show that: (1) she belongs to a protected class; (2) she was qualified for the job at which she suffered the prohibited action; (3) the prohibited action occurred despite her employment qualifications; and (4) the prohibited action was based on the protected characteristic. *Id.* at 868–69. In order to show that the prohibited action was based on the protected characteristic, employees may either offer direct evidence of discrimination or present facts raising an inference of discrimination.

An inference of discrimination can be raised by presenting evidence that a "similarly situated" employee who did not share the protected characteristic engaged in the same conduct, but was treated differently. *Hollins v. Fed. Nat. Mortg. Ass'n*, 760 A.2d 563, 578 (D.C. 2000). "An employee is considered

similarly situated to the plaintiff for the purpose of showing disparate treatment when all of the relevant aspects of the plaintiff's employment situation are nearly identical to those of the other employee." *Id.* (internal quotation marks omitted). The similarity between the two comparators "must exist in all relevant aspects of their respective employment circumstances, which would surely include both their rank in the company and the alleged misconduct." *Id.* (citation omitted). To show that alleged misconduct is sufficiently similar, the plaintiff and the comparator must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell v. Toledo Hospital*, 964 F.2d 577, 538 (6th Cir. 1992)). If the plaintiff and the comparator are sufficiently similar, but do not share the protected characteristic, a jury may infer that the prohibited action was based on the protected characteristic. *Id.* at 576 ("[I]n order to establish a *prima facie* case of racial discrimination in the decision to terminate, appellant had to come forward with evidence that he was fired from a job for which he was qualified while white employees, similarly situated to him, were not terminated, but rather treated more leniently.") (brackets omitted).

If the prima facie case is established, the employer must proffer a legitimate, non-discriminatory reason for the prohibited action. If that occurs, the burden of

production shifts back to the employee to demonstrate that the ostensibly legitimate reason was pretextual; that is, "that the employer's stated justification for its action was not its true reason but was in fact merely a pretext to disguise discriminatory practice." *Hollins*, 760 A.2d at 571 (internal quotation marks omitted). "This burden merges with the ultimate burden of persuasion on the question of intentional discrimination." *Atl. Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1100 (D.C. 1986). To carry that ultimate burden, the employee must show "*both* that the reason was false, *and* that discrimination was the real reason." *Hollins*, 760 A.2d at 571–72 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993)) (emphasis in original). Thus, appellant must "present evidence showing not only that [the proffered justifications] were a pretext for terminating [her] but also that they were a pretext for terminating [her] *because of [her] race, i.e.*, that race was the real motivating factor." *Id.* at 573 (emphasis in original).

## 2. Adverse Employment Actions

Johnson initially alleged that she had suffered multiple adverse employment actions. However, during oral argument, counsel conceded that Johnson had not established a prima facie case of pay disparity. Additionally, Johnson's claim that

her workload increased to the point where it became a prohibited employment action is not supported by the record; indeed, one of the core issues surrounding her termination is that she never assumed many of the duties she was assigned. She has not produced nearly enough evidence to demonstrate that her workload increased to the point where it would become an act of discrimination cognizable under the DCHRA. Because "mere conclusory allegations" do not suffice at the summary judgment stage, *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007), her complaints about workload do not merit further analysis. Lastly, she claims that the denial of her request for a transfer is an additional violation of the statute. While the denial of a transfer may qualify as a prohibited employment action under some circumstances,[12] here that denial is inextricably wrapped up within her termination. Because the two essentially occurred simultaneously, we do not see good reason to analyze them as separate events, and instead proceed to discuss the termination issue.[13]

---

[12] *See, e.g.*, *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 889 (D.C. 2003) (listing "denial of transfer" as a potential "discrete retaliatory or discriminatory act").

[13] While we ultimately affirm, we do not rely on the trial court's statement that "it is clear from the oral argument that Plaintiff is not claiming discrimination under the DCHRA. She is claiming that others were accommodated, and she was not. That is not the law." The denial of "accommodation" in the form of a transfer may be an adverse employment action. *See Lively*, 830 A.2d at 889. More

(continued…)

### 3. Pretext

We hold that Johnson has failed to show that the non-discriminatory reason presented by appellees for her termination was a pretext for racial discrimination. Because she has failed to produce evidence sufficient to meet her burden of production on that issue, she cannot meet her "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff" and summary judgment is appropriate. *Hollins*, 760 A.2d at 571 (quoting *St. Mary's Honor Center*, 509 U.S. at 507).

The asserted reason for Johnson's termination—her failure to support and lead the reorganization of CSSD—is a legitimate and non-discriminatory reason with ample support in the record. Various defendants emphasized to Johnson at numerous points between April and September 2011 that her support, as a leader in CSSD, was crucial for the restructure to be a success. Despite this plainly expressed need, Johnson did not complete some tasks related to the reorganization and substantially delayed completing others. Johnson nonetheless claims that this

---

(…continued)
broadly, disparate treatment can provide evidence of unlawful employment actions. *Hollins*, 760 A.2d at 578.

given reason was a pretext. However, Johnson has contributed no evidence that the institutional need and frustration over her lack of leadership were not genuine. Instead, she claims that the defendants were mistaken in their interpretations of her actions because her delays in completing assignments were merely the result of her need for further clarification before she could properly engage the tasks.

That claim is insufficient to forestall summary judgment. Taking all of Johnson's assertions as true and drawing all reasonable inferences in her favor, she still has not established that the proffered reason was "a pretext for discrimination either directly by [proving] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Hollins*, 760 A.2d at 573 (internal quotation marks omitted).

Johnson has offered no direct evidence of racial discrimination. Therefore, she must show that the reason proffered by the District is unworthy of credence by demonstrating *that it was not a genuine motivation*. That is, she cannot merely argue that the decision to terminate her was a poor business judgment, she must show that the employer was not being candid when it asserted that her termination was motivated by its non-discriminatory reason. *Hollins*, 760 A.2d at 573–74.

Because she must carry both the burden of production on the issue of pretext and the ultimate burden of showing intentional discrimination at trial, if she cannot point to evidence of this lack of candor, summary judgment is appropriate.

Johnson's allegations do not demonstrate that OAG's announced reason for terminating her was pretextual. She claims that their interpretations of her actions and inactions were *mistaken*, but presents no evidence that their assertions were not made in *good faith*. Even if Rice, Chandler, Adams, and Nathan were all mistaken in their assessments of Johnson's motivations when she delayed preparing policy documents, persisted in disputes over workload and ethics long after defendants viewed them as resolved, and failed to take any initiative to ensure that the reorganization would be successful, this would not show that their proffered reason was a *pretext*, a falsehood generated for the purpose of masking their true reasons. It would only demonstrate that their perspectives were misinformed.

Lastly, Johnson reincorporates the same arguments that she makes in claiming that Adrianne Day was similarly situated to her.[14] She claims that her

---

[14] Johnson also offers the names of three other possible comparators. However, she has not developed a record or presented arguments to show why any of the three should be considered a relevant comparator and we deem the issue waived. *See McFarland*, 935 A.2d at 351.

arguments regarding their similarities show disparate treatment and thus establish pretext.  However, while Day and Johnson were similarly situated in some ways, their similarities do not lead to an inference of pretext.  Appellant's brief claims that "Ms. Day engaged in actual insubordination, but was not terminated" and alleges that Day sent inappropriate e-mails in 2006, "displayed inappropriate body language" during a meeting in 2009, and had a generally negative relationship with Rice.  However, while a reasonable inference could be drawn that Day and Johnson had similarly tense relationships with Rice, or were at least similarly enough situated with regard to that kind of conduct, interpersonal conflict with Rice is not the reason for termination that Johnson must expose as pretextual.  Although AG Nathan did comment that he was "troubled" by Johnson's "immature" and "inappropriate" interactions with Rice, he emphasized that "[her] termination was proposed in response to [her] conduct in connection with the September 2011 restructure."  The letter of termination details specific tasks related to the restructuring "and [Johnson's] continued efforts to resist these assignments," ultimately explaining that the reason for her termination was her "fail[ure] to support the restructure by [her] actions or inactions in a circumstance where [her] support was needed and reasonably expected."

Day's actions are not comparable to Johnson's lack of support for the reorganization of CSSD; indeed, as her transfer and the shifting of her duties served as the catalyst of the reorganization, Day could hardly be as relevant a comparator as the other section chiefs, who were also reacting to changing roles and new duties. It is undisputed that the other section chiefs—who were also African-American—were "meeting with their staff, doing the things that are necessary to make the restructure a success," and that Rice felt that she "needed the same from [Johnson]."[15] Moreover, it is noteworthy that Day completed all transition-related tasks promptly and to the satisfaction of the management team. Johnson's allegations about their similar duties, interpersonal conflicts, and job

---

[15] "Where an employer has a strong record of equal opportunity employment, any inference of discrimination arising from the discrediting of the employer's explanation may be a weak one, and in some cases not strong enough to let a reasonable factfinder conclude that discrimination has occurred at all." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998). Further, "[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002) (quoting *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995)). Here, there is abundant evidence of equal opportunity; Rice hired Johnson in the first instance, Rice and Adams are both African-American, and all of the other CSSD section chiefs were African-American at the time of Johnson's termination. Accordingly, "there may be no legitimate jury question as to discrimination in a case in which a plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue, and there is abundant independent evidence in the record that no discrimination has occurred." *Aka*, 156 F.3d at 1291.

titles do not support an inference that the employer's proffered reason for Johnson's termination was a pretext for racial discrimination.

## III.  Conclusion

The DCWPA is not meant to be a "weapon in arguments over policy," *Zirkle*, 830 A.2d at 1259–60 (quoting *Lachance*, 174 F.3d at 1381), and Johnson's allegations do not rise above general disagreements with managerial decisions, even if she claims that some of those decisions turned out to be unwise.  Other claims are unrelated to the larger agency mission or describe personal grievances; most importantly, her claims about the DCCSES database and the restructuring of CSSD are not true "disclosures" that implicate the kinds of government misconduct the DCWPA is meant to combat.  *See generally* D.C. Code § 1-615.51. Appellant has failed as a matter of law to make out a prima facie case under the DCWPA.

The DCHRA does not prohibit employers from terminating at-will employees for reasons that the employee believes are misguided.  Instead, the DCHRA forbids terminating employees for particular reasons, such as their race. *See Hollins*, 760 A.2d at 573–74 ("Even assuming *arguendo* that the investigations

were flawed, the reliability of the investigations and reports is irrelevant. The only questions pertinent here are whether Fannie Mae believed, in good faith, that Hollins had committed [] violations . . . and whether its decision to discharge Hollins was based on that belief."). Johnson's allegations regarding pretext amount to, at best, a claim that her employer terminated her because she was undervalued and the District misjudged her actions. She has not provided the necessary proof of racial discrimination.

The judgment of the Superior Court is

*Affirmed.*