*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CV-0826

JAMES HOLBROOK, *ET AL.*, APPELLANTS,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-5211-14)

(Hon. Florence Y. Pan, Trial Judge)

(Argued March 23, 2021                    Decided  September 23, 2021)

*Neil L. Henrichsen* for appellants.

*Sonya L. Lebsack*, Assistant Attorney General, with whom *Karl Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, were on the brief, for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and LONG,* *Senior Judge, Superior Court of the District of Columbia*.

---

* Sitting by designation pursuant to D.C. Code § 11-707(a) (2001).

DEAHL, *Associate Judge*:  James Holbrook, Larry Bishop, Sonji Johnson, and Collins Snow sued the District of Columbia alleging violations of the D.C. Whistleblower Protection Act (WPA), D.C. Code §§ 1-615.51, *et seq.* (2016 Repl.). They claim they were fired by the District of Columbia Department of Corrections (DOC) in retaliation for refusing to engage in, and objecting to, DOC's unlawful treatment of two other employees (Deon Jones and Andra Parker).  The trial court granted the District's motion for summary judgment, concluding that appellants did not adduce evidence from which a reasonable jury could find that they were retaliated against for engaging in conduct protected under the WPA.  In other words, they did not establish a so-called "prima facie case."  *Johnson v. District of Columbia*, 225 A.3d 1269, 1280 (D.C. 2020).

We disagree.  The WPA protects an employee's refusal to comply with an illegal order and their disclosure of information that they reasonably believe evinces illegal conduct.  D.C. Code §§ 1-615.53(a), 1-615.52(a)(4), (6).  Appellants' conduct, when we view the evidence in the light most favorable to them, includes both refusals to comply with illegal orders and disclosures that they reasonably believed evinced illegal conduct.  They refused to comply with illegal orders when each of them defied DOC's instructions to treat Jones and Parker in a discriminatory manner, and they disclosed information that evidenced unlawful conduct when each

of them objected to DOC's disparate treatment of Jones and Parker.  They also made a sufficient showing of a causal link between their protected conduct and their terminations.  Evidence substantiated that DOC all but explicitly instructed staff to harass Jones and Parker, and threatened to fire those who refused.  Appellants each refused to do so and were subsequently fired.  Under these circumstances, a jury might reasonably find that appellants' terminations were causally related to their protected conduct under the WPA.  A prima facie showing was therefore made.

The District offers an alternative basis to affirm.  It contends that even if appellants made a prima facie showing of retaliation, thereby shifting the burden to the District to demonstrate an independent and legitimate basis for their terminations, *see* D.C. Code § 1-615.54(b), the District carried that burden.  We disagree.  The District's proffered independent reasons for appellants' terminations do not warrant summary judgment in its favor; they lack corroborating evidence and are undermined by the significant evidence in the record suggesting appellants' terminations were prompted by their protected conduct.  We accordingly reverse and remand to the trial court for further proceedings.

**I.**

**A. Allegations Supporting the WPA Claims**

In 2007, Deon Jones and Andra Parker filed a lawsuit against their employer, DOC, claiming discrimination based on their sexual orientation. Although the case settled in 2011, their lawsuit allegedly triggered a wave of retaliatory conduct directed toward them.[1] That retaliation included receiving undesirable work assignments, having various work requests denied, being ostracized by their supervisors, and enduring homophobic slurs. Jones and Parker made numerous complaints about the retaliation, including in letters addressed to then-Mayor Vincent Gray, but the harassment continued. Fearing for their safety, Jones and Parker eventually requested to be placed on administrative leave, which DOC granted in October 2013.

The retaliation stemmed, in part, from directives DOC Director Thomas Faust gave to his supervisory staff to treat Jones and Parker differently than other employees. Deposition testimony indicated that Director Faust told his staff they

---

[1] Because this appeal arises from a grant of summary judgment, the facts below are recited in the light most favorable to appellants, the non-moving party. *Johnson*, 225 A.3d at 1275.

"need[ed] to show Jones and Parker that they[ were] not running the facility," and that "he wanted something done" because he "was tired of complaints and stuff coming from Parker and Jones." DOC staff assumed this meant they "need[ed] to make [Jones's and Parker's] lives miserable on the shift" and that they should "target" them for disciplinary write-ups. Those who did not participate risked repercussions. As Director Faust put it: "the train [was] leaving the station," and if his staff did not "get onboard and start thinking and doing things his way, then [they] wouldn't be on the train." When supervisors did assist Jones and Parker, other employees warned them that doing so would get them in "trouble" or fired, and that not being a "team player" could "cost" them.

Appellants in this matter are four former management officers for DOC who supervised Jones and Parker at various points after settlement of their 2007 lawsuit. They each claim they were unlawfully terminated in retaliation for their objections to how Jones and Parker were being treated, and for their refusals to actively participate in such treatment.

*i. James Holbrook*

James Holbrook claims he refused to partake in the discriminatory treatment of Jones and Parker on two occasions. The first occurred in early 2011, when

Holbrook granted Parker's medical leave request despite instructions from his supervisor not to do so. After granting the leave request, Holbrook was "chastised" by his supervisors, to which he responded that he would not treat Parker differently from other employees.

The second incident occurred around August 2013, when Jones approached Holbrook about potential re-assignment to an open position under Holbrook's purview. Holbrook thought Jones "was a good candidate for the position," but his supervisor rejected the re-assignment, telling Holbrook to "[l]eave [Jones] alone." Holbrook initially complied with his supervisor's directive, but when Jones inquired about the position two to three weeks later and provided a memorandum requesting the re-assignment, Holbrook again raised the possibility of Jones's re-assignment to his supervisor. Holbrook's supervisor again brushed off the re-assignment request, and Holbrook objected, telling his supervisor that he had "no viable excuse or reason not to give [Jones] th[e] position" and that he was "trying to treat [Jones] the same as [he] would any other officer." Holbrook was informed of his termination "a couple weeks later," effective September 30, 2013.

## ii. Larry Bishop

Larry Bishop recounted being involved in three instances relating to the discriminatory treatment of Jones and Parker, all occurring after he was instructed not to assist them without first seeking approval from supervisors. The first two instances involved Parker: on separate occasions in June and July 2013, Bishop changed Parker's leave status and post assignment without obtaining pre-approval from his supervisor. After each, Bishop was "chewed out" by his supervisor and told not to move Parker from his post or to grant his leave requests without approval. When he complained that was "not the normal procedure[s]" and questioned "[w]hy [he] ha[d] to go through" his supervisor to approve those routine requests, he was told to "just do what I tell you to do." Bishop then began to notice a change in how his colleagues were treating him; while previously he was "the go-to person" if someone "want[ed] something done," after changing Parker's post assignment and leave status, his colleagues "started shunning [him] and not letting [him] do anything." Frustrated with his treatment, Bishop filed a complaint regarding how his supervisor was having him treat Parker, and further complaining about his own treatment stemming from his initial refusal to comply.

The third incident occurred in September 2013 when Bishop signed Jones's workers' compensation forms without pre-approval. Shortly after doing so, Bishop's supervisor called him into his office, "slammed the door," and told Bishop that he needed to leave Jones and Parker alone or he was going to get fired. A week or so later, on September 12, 2013, Bishop learned of his termination, effective the same day as Holbrook's termination, September 30, 2013.

*iii. Sonji Johnson*

Sonji Johnson claims she either objected to, or refused to participate in, DOC's discriminatory treatment in two instances. The first was around the spring of 2011, when Johnson's supervisor gave her a pre-written reprimand directed at Parker for a "miscount," and instructed her to issue it. She refused because—based on instructions given during staff meetings implying that supervisors should "target" Jones and Parker for write-ups—she believed the reprimand was unwarranted and was meant "to harass Parker." She looked into the matter further and determined that Parker was not at fault for the miscount. When Johnson informed her supervisor of this, he directed her to write Parker up anyway and exclaimed that he did not tell her "to conduct a fucking investigation." Johnson still refused, and told her

supervisor that she was "not going to write [up an] officer[] knowing that it's wrong."

Later that same year, in October 2011, Johnson signed off on a workers' compensation claim for Parker after he was hurt on the job. After doing so, she spoke with her supervisor who asked if she had "lost [her] mind" and that she was going to get in "trouble" for doing so because "nobody be approving no paperwork for Parker and Jones." Johnson's supervisor then instructed her not to verify the claim when the claims examiner called her. Johnson defied the instruction because she believed it was discriminatory and "substantie[d] the claim" on a follow-up call with the claims examiner. She was then called into a meeting with four of her supervisors where she was told that she was "expected to be a team player and right now [she] wasn't being a team player and that could cost [her]." Johnson responded by saying that she "was not going to do anything that was unethical" and that she "didn't understand why [she] couldn't treat Corporal Parker the way that [she] would treat any other employee." About four months later, in February 2012, Johnson was fired.

*iv. Collins Snow*

Collins Snow recounted one instance where he expressed disagreement with the way Jones and Parker were being treated. In 2010, Snow was "chastised" by his supervisor for granting a leave request for Jones. Snow claims he "stood up" to his supervisor in this instance, stating that he did not understand why he could not grant Jones's leave request and that "[h]ad it been someone else" besides Jones making the request, "it wouldn't have been any . . . issue." Snow also highlights the fact that his name appeared on the witness list for Jones and Parker in the 2007 litigation, though he did not realize it until after he was terminated. Snow was terminated in February 2012, on the same day as Johnson.

**B. Trial Court Proceedings**

Contending they were terminated because of their objections and resistance to DOC's treatment of Jones and Parker, appellants filed a complaint against the District alleging they were unlawfully retaliated against in violation of the WPA, D.C. Code § 1-615.53(a). Jones and Parker were also plaintiffs in the action. They alleged unlawful retaliation under both the WPA and the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1402.61(a) (2016 Repl.), both of

which prohibit an employer from retaliating against an employee for complaining about sexual orientation discrimination.

The District moved for summary judgment as to all parties. It argued that appellants' objections to the treatment of Jones and Parker were not protected under the WPA, and even if they were, appellants did not demonstrate a causal link between their protected activity and their terminations. As for Jones and Parker, the District argued summary judgment was appropriate because both requested that they be placed on administrative leave, so DOC granting that request could not be retaliatory under either the WPA or DCHRA. The trial court denied the District's summary judgment motion with respect to Jones and Parker, concluding that they substantiated a retaliation claim that went beyond their placement on administrative leave by proffering evidence of an abusive workplace environment. But the court granted the District's motion as to appellants. It reasoned that their objections to the treatment of Jones and Parker were, for the most part, not protected conduct under the WPA. To the limited extent the trial court found that some protected disclosures were made, it determined that appellants could not demonstrate the necessary causal link between that conduct and their terminations.

Approximately two years later, Jones and Parker settled their claims against the District, prompting the trial court to dismiss and close the case. Appellants then filed this timely appeal arguing it was error for the trial court to grant summary judgment in favor of the District on their WPA claims.

**II.**

We review the trial court's grant of summary judgment de novo, undertaking "an independent review of the record . . . by examining and taking into account the pleadings, depositions, and admissions along with any affidavits on file." *District of Columbia v. District of Columbia Pub. Serv. Comm'n*, 963 A.2d 1144, 1155 (D.C. 2009). The record, as well as any reasonable inferences therefrom, must be viewed in the light most favorable to the non-moving party—in this case, appellants. *Bailey v. District of Columbia*, 668 A.2d 817, 819 (D.C. 1995). If we determine that record evidence exists on which a jury could properly reach a verdict for appellants on their WPA claims, then summary judgment was granted in error, and we must reverse. *Ukwuani v. District of Columbia*, 241 A.3d 529, 541 (D.C. 2020).

Whether a jury could return a verdict favorable to appellants here depends, first and foremost, on whether they presented sufficient evidence to make out a prima facie case of retaliation under the WPA. A prima facie case consists of evidence

from which a reasonable jury could conclude that appellants were retaliated against by their employer for engaging in conduct protected under the WPA. *Johnson*, 225 A.3d at 1275 (citing D.C. Code § 1-615.53(a)). That requires evidence that (1) appellants engaged in protected conduct, and (2) their terminations were causally related to that conduct. *See id.* The trial court found that appellants did not carry this threshold burden. We disagree.

## A. Protected Conduct Under the WPA

Protected conduct under the WPA includes (1) refusals to comply with an "illegal order" and (2) "protected disclosure[s]." D.C. Code § 1-615.53(a). The Act defines an "illegal order" as "a directive to violate or to assist in violating a federal, state or local law, rule, or regulation." *Id.* § 1-615.52(a)(4). It further defines a "protected disclosure" as including "any disclosure of information . . . that the employee reasonably believes evidences . . . [a] violation of a federal, state, or local law, rule, or regulation."[2] *Id.* § 1-615.52(a)(6)(D). Appellants claim they presented

---

[2] The WPA delineates several other categories of protected disclosures, but this is the only category appellants adequately advance on appeal. While they occasionally allude to other categories in their brief (abuse of authority, public safety, and gross mismanagement), we consider these arguments waived as they are "unaccompanied by some effort at developed argumentation." *Johnson*, 225 A.3d at 1277 n.5. The closest appellants get to pressing one of those alternative theories

evidence of both types of protected conduct. As for non-compliance with an illegal order, they rely on their defiance of DOC's instruction to treat work requests received from Jones and Parker differently from other employees, which they considered to be instructions to violate, or assist in violating, the DCHRA. As for protected disclosures, they rely on the various express objections they made to their supervisors about the discriminatory treatment of Jones and Parker, which they maintain constituted reports of conduct violating the DCHRA. We agree on both points.

*i. Refusals to Comply with Illegal Orders*

Appellants contend that DOC's repeated instructions—from Director Faust and his management team—to treat work requests from Jones and Parker differently from other employees were directives to violate, or assist in violating, the DCHRA. They further contend their refusals to comply with those illegal directives were thus protected conduct under the WPA. D.C. Code § 1-615.53(a). We agree.

---

is a footnote in their reply brief, where they state—without support—that "differing treatment of Jones and Parker are necessarily an abuse of authority." Even if we considered that conclusory assertion a sufficiently developed argument, "[i]t is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief." *Stockard v. Moss*, 706 A.2d 561, 566 (D.C. 1997).

The DCHRA prohibits an employer from retaliating against an employee who complains about discrimination in the workplace. D.C. Code §§ 2-1402.11(a)(1)(A), 2-1402.61(a); *see Ukwuani*, 241 A.3d at 546. Jones and Parker alleged they were retaliated against by way of an abusive and harassing workplace environment after they complained of sexual orientation discrimination. The trial court found there was sufficient evidence for a jury to conclude that Jones and Parker were unlawfully retaliated against in violation of the DCHRA—through undesirable work assignments, having their work requests denied, being ostracized, and so on—and the District does not cast doubt on that ruling in this appeal. It follows that (1) DOC directives that employees assist in that unlawful retaliation against Jones and Parker would constitute an illegal order under the WPA, *see* D.C. Code § 1-615.52(a)(4), and (2) that an employee's refusal to comply with such directives would be protected conduct under the WPA, *id.* § 1-615.53(a).

Viewed in the light most favorable to appellants, the evidence supports both of those inferential steps. Each appellant was directed to assist in the unlawful retaliation against Jones and Parker and each refused to comply:

- Holbrook approved a leave request for Parker after he was instructed not to do so.

- Bishop re-assigned Parker, changed Parker's leave status, and approved Jones's workers' compensation claim, all in contravention of instructions not to assist Jones and Parker.

- Johnson substantiated a workers' compensation claim for Jones after being told not to do so, and refused an order to write Parker up for a miscount that he did not commit.[3]

- Snow granted a leave request for Jones contrary to Director Faust's directives.[4]

A reasonable jury could find that each of these refusals was in defiance of unlawful orders and so is protected conduct under the WPA.

The trial court found otherwise, concluding that there was nothing illegal about directing appellants to refer matters regarding Jones and Parker—leave requests, shift changes, and the like—to supervisors up the chain of command. In the trial court's view, each appellant's defiance of such orders could not "be considered a refusal to comply with an illegal order, because . . . instructions" on

---

[3] The District claims this charge was forfeited by Johnson because it was not raised during summary judgment briefing. Since the charge was raised in appellant's complaint, part of the summary judgment record, addressed by the trial court in its grant of summary judgment, and raised on appeal, we conclude it was not forfeited.

[4] The record is not clear as to whether Director Faust gave any such directives *before* Snow granted this leave request, yet the District seems to acknowledge that Snow's approval of Jones's leave request defied Director Faust's directives for how staff was to handle Jones's and Parker's personnel requests. So we treat the point as conceded for purposes of this appeal.

how to treat a given employee's work requests are "not illegal." That paints with too broad a brush. Instructions on how to treat a particular employee's personnel requests can absolutely be illegal, for instance, when those instructions are discriminatory in both intent and effect. Here we have considerable evidence that these directives—targeted only at Jones and Parker—were a way to harass and intimidate them after they complained of discriminatory treatment. The record evidence includes, to scratch the surface of it: (1) Director Faust's comment that he "was tired of complaints . . . coming from Parker and Jones," (2) his instruction to his staff that they needed to show Jones and Parker that they were "not running the facility," and (3) his staff's understanding that this meant they needed to make Jones's and Parker's "lives miserable." Where Jones's and Parker's retaliation claims under the DCHRA survived summary judgment, it follows that DOC directions for its employees to contribute to that retaliation would be unlawful orders to assist in violating the DCHRA, and that appellants' defiance of such orders would be protected conduct.

The District provides an alternative defense of the trial court's ruling. It argues that Jones and Parker did not suffer any adverse action as a result of how their various work requests were handled, a necessary component for establishing a DCHRA violation. *See Kumar v. District of Columbia Water & Sewer Auth.*, 25

A.3d 9, 17 (D.C. 2011). But that reads appellants' claims too narrowly. They were not defying one-off instructions about how to handle one personnel request or another, but instead were opposing the pervasive scheme animating Jones's and Parker's hostile work environment claims. They refused to contribute to that environment—as each of them, to one degree or another, expressly said when defying orders to treat Jones and Parker differently, *supra* Part I.A. And a jury could find that the hostile environment appellants refused to nurture ultimately led to adverse actions against Jones and Parker, a point the District does not dispute. So the relevant retaliation experienced by Jones and Parker is not confined to the manner in which any given personnel request was handled, but instead includes those adverse actions ultimately suffered by Jones and Parker as a result of their disparate treatment. *See Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 890 (D.C. 2003) (the "entire mosaic" should be considered when evaluating a DCHRA hostile work environment claim). The individual directives were mere cogs in a wheel that appellants refused to help turn—or so a jury might reasonably find.

### ii. Protected Disclosures

Appellants also claim they made protected disclosures when they voiced objections to DOC's directives. According to appellants, their objections exposed

DOC's unlawful and discriminatory treatment of Jones and Parker, and were thus protected under § 1-615.52(a)(6)(D) of the WPA.  Those objections include:

- Holbrook telling his supervisor that he would not treat Parker differently from other employees after he was reprimanded for granting a leave request for Parker.

- Holbrook informing his supervisor that he was treating Jones as he would any other employee after he was instructed not to assist Jones with a re-assignment request.

- Bishop filing a complaint regarding the alleged retaliation he personally experienced after granting work requests for Parker.

- Johnson telling her supervisors that she would not treat Parker unethically or any differently from other employees after her supervisors insinuated she could be fired for substantiating Parker's workers' compensation claim.

- Snow "st[anding] up" to his supervisor and telling him he "didn't understand why [he could not grant a leave request for Jones]" and that had the leave request been from anyone else, there would have been no pushback.[5]

---

[5] Snow also claims that his name's appearance on the witness list for Jones and Parker in their 2007 lawsuit constitutes a protected disclosure under the WPA. We disagree.  To the extent Snow actually intended to testify, there is no evidence that he disclosed that intent to anybody; he was unaware that his name was on the witness list.  That is not to say an employee's intent to testify regarding unlawful conduct by their employer is unprotected under the WPA. *Cf. Bryant v. District of Columbia*, 102 A.3d 264, 267-69 (D.C. 2014) (intent to testify protected activity under the DCHRA).  Just that, if it is protected, it is not a protected disclosure where the employee never actually discloses such an intent.

Each disclosure is protected under the WPA if it conveyed information "the employee reasonably believe[d]" evidenced "a violation of a federal, state, or local law." D.C. Code § 1-615.52(a)(6). In other words, this test is satisfied if the employee genuinely and contemporaneously believes that their disclosure evinces illegal conduct, and that genuine belief is reasonable. *Johnson*, 225 A.3d at 1276. Appellants presented substantial evidence supporting both parts of that test.[6]

---

[6] This court has previously questioned whether there is any "disclosure" at all where the report conveys information already known to its recipient. *Wilburn v. District of Columbia*, 957 A.2d 921, 925-26 (D.C. 2008). As particularly relevant here, some federal courts have held—albeit in interpreting a prior iteration of the federal Whistleblower Protection Act—that a "disclosure of wrongdoing to the wrongdoer herself is not whistleblowing." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 275 (4th Cir. 2001) (citing *Willis v. Dept. of Agriculture*, 141 F.3d 1139, 1143 (Fed. Cir. 1998)). We note, however, that those federal authorities seem to have been abrogated by 2012 amendments to the federal Whistleblower Protection Act which clarify that reports to the wrongdoer herself may yet qualify as protected disclosures. 5 U.S.C. § 2302(f)(1)(A) ("A disclosure shall not be excluded" from the Act's protection because it "was made to a supervisor or to a person who participated in" the reported wrongdoing), *as amended by* Pub. L. 112-199 (Nov. 12, 2012) ("Section 101. Clarification of Disclosures Covered"). We do not address or opine upon this nuance as neither the District nor the trial court suggests these reports are not protected disclosures because of the persons to *whom* they were communicated, but instead, each focuses on the content of the reports. We therefore do likewise.

a. Genuine Contemporaneous Belief

The words spoken by appellants provide sufficient evidence for a jury to conclude they genuinely believed their objections evidenced illegal conduct. When objecting to DOC's treatment of Jones and Parker, appellants told their supervisors that the treatment was unfair and disparate when compared to the treatment of other employees. *See supra* Part II.A.ii. Appellants explained during discovery that they believed those statements expressed their beliefs that DOC's treatment of Jones and Parker was unlawful.[7] Appellants thus provided ample support that they genuinely and contemporaneously believed their conduct evidenced illegal activity.

The District argues that we should not consider appellants' after-the-fact characterizations during litigation, and that the words actually used by appellants "belie[] [their] claim that [they] intended to" report wrongdoing covered by the WPA, because appellants did not use the words "unlawful," "illegal" or "DCHRA"

---

[7] Holbrook testified that he believed his communications with his supervisors demonstrated his belief "that Jones was not being treated consistently with the District's laws." Bishop testified that he believed DOC's treatment of Jones and Parker was unlawful. And both Johnson and Snow swore, under penalty of perjury in signed affidavits, that they believed DOC's treatment of Jones and Parker was unlawful.

when making their objections.  We disagree with several aspects of that argument, along with its bottom line.

First, in determining whether appellants made out a prima facie case, we are free to consider their after-the-fact characterizations of what they believed their objections conveyed.  That is particularly appropriate here because those characterizations are in perfect alignment with their contemporaneous objections.  It is certainly true that when determining whether an employee subjectively believed their conduct evidenced illegal activity, this court has stated that "we look to 'the statements in [the whistleblower's] complaint to a supervisor or to a public body, not [their] subsequent characterization of those statements in litigation,'" *Johnson*, 225 A.3d at 1276 (quoting *Wilburn*, 957 A.2d at 925).  But we have endorsed that reasoning only where the whistleblowing employee's contemporaneous disclosure betrayed no hint of wrongdoing.[8]  That is not the case here.  There is no incongruity

---

[8] *See, e.g.*, *Wilburn*, 957 A.2d at 926 (complaint stating that a law firm reviewing cases for a D.C. agency was not satisfactorily performing all of its work could not be later re-characterized as a complaint intending to disclose gross mismanagement or any other wrongdoing on the agency's part by retaining the law firm); *Johnson*, 225 A.3d at 1278-79 (declining whistleblower's post hoc allegations that a show-cause order evidenced wrongdoing on the part of the Office of the Attorney General where whistleblower's contemporaneous reaction was to blame the judge for bias and inappropriate conduct, not gross mismanagement or a violation of law); *Freeman v. District of Columbia*, 60 A.3d 1131, 1142-43 (D.C. 2012) (finding that whistleblower could not have possessed the necessary subjective

between appellants complaining to their supervisors that they wanted to treat Jones and Parker the same as other employees, and their later descriptions that those objections were to DOC's unlawful discriminatory treatment of Jones and Parker. The two are in harmony.

Even more fundamentally, we disagree with the District's contention that appellants' contemporaneous words did not convey a subjective belief that DOC's conduct was unlawful. The District makes much of the fact that, in the course of questioning their superiors' disparate treatment of Jones and Parker, appellants only characterized DOC's conduct as "unfair" and "unethical," rather than "unlawful" or "illegal." But appellants' failure to use legal terminology or to specifically mention the DCHRA in their objections is not fatal. If the "'complaint of unlawful discrimination may be inferred or implied' from the surrounding facts," then a whistleblower "need not employ any 'magic words' such as 'discrimination.'" *McFarland v. George Wash. Univ.*, 935 A.2d 337, 359 (D.C. 2007) (quoting *Carter-Obayuwana v. Howard Univ.*, 764 A.2d 779, 791 (D.C. 2001)) (ellipses and emphasis omitted); *see also Langer v. Dep't of Treasury*, 265 F.3d 1259, 1266 (Fed.

---

belief because he admitted during deposition that he did not believe his employer's conduct was potentially illegal until after he made his purported protected disclosure).

Cir. 2001) (reviewing surrounding circumstances to determine whether employee's statements "implicat[ed] an identifiable violation of law, rule, or regulation").[9]

Here, there is ample evidence that appellants believed they were objecting to the unlawful treatment of two DOC employees. Jones and Parker were singled out for differential treatment after filing a sexual orientation discrimination lawsuit against DOC. Appellants were each aware of this, and each testified or swore under oath to having knowledge of the disparate treatment Jones and Parker were subjected to:

- Holbrook testified that there "was a culture among [the] supervisors" not to assist Jones and Parker because of the 2007 lawsuit, and that Director Faust "made it clear . . . that Jones and Parker [did] not run anything."

- Johnson testified that staff members "were all asked to treat [Jones and Parker] differently," that Director Faust said "he wanted something done . . . starting with the front-line staff" because he "was tired of complaints and stuff coming from Parker and Jones," and that during command meetings, the supervisory staff would "gear [them] up towards targeting" Jones and Parker for disciplinary infractions.

- Bishop testified that everybody understood they were expected to make Jones's and Parker's lives "miserable on the shift" given the number of times Director Faust told his staff

---

[9] When interpreting the WPA, we consider case law applying the federal whistleblower statute instructive. *Wilburn*, 957 A.2d at 925.

that they "need[ed] to show Jones and Parker that they're not running the facility."

- And Snow swore under penalty of perjury that he witnessed the unlawful treatment of Jones and Parker from 2002 until 2012, and that supervisors identified Jones and Parker as "'troublemakers' because they filed complaints and workers' compensation claims."

With that context, their reports of discriminatory treatment provide compelling support for their testimony that they believed DOC was acting illegally.

### b. Objectively Reasonable Belief

There was evidence from which a jury might also conclude those beliefs were reasonable. This step of the inquiry asks whether "a disinterested observer with knowledge of the essential facts known to [the whistleblower] could reasonably conclude that the actions of" DOC evidenced illegality. *Johnson*, 225 A.3d at 1276. Considering the record evidence detailed above regarding what each appellant individually heard and knew about DOC's treatment of Jones and Parker,[10] a jury could readily find their beliefs were reasonable.

---

[10] As we explained in *Freeman*, 60 A.3d at 1152, an employee's belief cannot be considered reasonable under the "disinterested observer" test if they were not actually aware of the facts that made their belief reasonable. For that reason, we view appellants' knowledge of DOC's alleged discriminatory treatment of Jones and Parker individually as opposed to collectively.

The trial court found otherwise and summarily concluded that appellants' objections evidenced only a "disagreement" with their supervisors' directions, so a "disinterested observer" could not have reasonably believed that appellants' objections evidenced illegal conduct. For support, the trial court cited *District of Columbia v. Poindexter*, 104 A.3d 848 (D.C. 2014), where this court stated that "debatable differences of opinion concerning policy matters are not protected disclosures." *Id.* at 855 (citing *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)). But appellants' objections were not mere differences of opinion over policy decisions; they were objections to unlawful discriminatory treatment. And as the Federal Circuit explained in *White*—which this court relied upon in *Poindexter*—disclosures involving "a reasonable belief that a violation has occurred" are protected even if "the existence of an actual violation may be debatable." 391 F.3d at 1382 n.2; *id.* ("The non-debatable requirement does not, of course, apply to alleged violations of statutes or regulations."). The trial court's reliance on *Poindexter* is thus misplaced.

The District offers two additional arguments for why no jury could conclude appellants' beliefs were reasonable, but neither is convincing. First, the District asserts that it would have been "implausible" for a "supervisory officer[] well-versed in the chain of command" to "reasonably believe[] that the DCHRA governed a

directive that a Major rather than a Captain handle . . . mine-run personnel matters." But appellants do not allege that the DCHRA is violated whenever a DOC policy dictates who should handle work requests. They allege that the DCHRA is violated when "mine-run personnel matters" are used as a weapon to retaliate against an employee's right to complain about discriminatory treatment in the workplace. There is nothing implausible about that.

Second, citing *Freeman*, 60 A.3d at 1152, the District claims appellants never sought clarification as to whether DOC's instructions violated the DCHRA and thus, they should not be rewarded for remaining "unjustifiably ignorant of information that would have refuted or cast doubt on [their] charges." While it is true that facts "readily ascertainable" to a purported whistleblower that would defeat an inference of wrongdoing under the WPA must be considered when divining reasonableness under the "disinterested observer" test, *id.*, the District is curiously silent as to what "readily ascertainable" information could have "refuted or cast doubt" on appellants' DCHRA charges. Not only that, it completely ignores Bishop's testimony that on at least three separate occasions he asked what possible legitimate reasons DOC had for its disparate treatment of Jones and Parker,[11] only to be stonewalled each time.

---

[11] The three occasions include: (1) when Bishop asked his supervisor why he could not sign Jones's workers' compensation claim, he was told to "leave Parker

Whistleblowers are not "unjustifiably ignorant" if their inquiries go unanswered, or when there is no compelling reason to think the answers to their inquiries would have dispelled rather than confirmed their beliefs.

## B. Causal Nexus between the Conduct and the Terminations

Because appellants presented sufficient evidence that their conduct was protected under the WPA, we consider whether evidence supported that such conduct was a "contributing factor" to their respective terminations. D.C. Code § 1-615.54(b). In other words, we consider whether appellants' refusals to follow DOC's illegal orders or their objections to DOC's unlawful retaliatory treatment of Jones and Parker were causally connected to DOC's decisions to terminate them. *See Kolowski v. District of Columbia*, 244 A.3d 1008, 1013 (D.C. 2020) (citing D.C. Code § 1-615.52(a)(2)). There is sufficient evidence to support that causal nexus.

---

and Jones alone"; (2) when Bishop asked another supervisor why Jones and Parker could not be treated according to "normal procedure[]," the supervisor responded with, "just do what I tell you to do"; and (3) when Bishop then sought a meeting with that same supervisor to discuss his complaint about the blowback he was receiving as a result of his refusal to treat Jones and Parker differently, he waited for four hours without his supervisor showing up and was never able to reschedule the meeting.

The District maintains, to paraphrase: (1) that appellants have produced no smoking gun establishing that their terminations were motivated by retaliatory animus, and (2) that the temporal proximity between appellants' protected conduct and their terminations is not, by itself, sufficient to give rise to an inference of causation. Maybe so, but neither point is of much help to the District. As to the first, it is quite "common that causation elements dependent upon the intent of an actor would be proven by circumstantial rather than direct evidence." *Payne v. District of Columbia*, 722 F.3d 345, 354 (D.C. Cir. 2013). As to the second, whether the timing of appellants' terminations vis-à-vis their protected conduct is itself sufficient to give rise to an inference of causation is of little moment. There is much more than temporal proximity supporting a causal nexus in each of appellants' cases. *See generally Kachmar v. SunGuard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (asking whether "the proffered evidence, looked at as a whole . . . suffice[s] to raise the inference" of causation in analogous Title VII context).

Director Faust told his staff that Jones and Parker "didn't run this fucking agency," that he was "tired of complaints and stuff coming from [them]," and that "the train [was] leaving the station" so that if staff members did not "get onboard and start thinking and doing things his way, then [they] wouldn't be on the train." Lo and behold, when appellants refused to hop aboard, they were fired, which is

precisely what their bosses warned them would happen if they did not start being "team player[s]."[12]  When an employer threatens to fire any employee who refuses to obey an order, and then follows through on that threat, it is not hard to infer that the employee's termination was causally related to that refusal.  *See Kachmar*, 109 F.3d at 178-79 (employer's statements that its employee's complaints about gender discrimination could negatively impact the employee's job prospects was sufficient to infer the employee's termination was causally related to those complaints).  That is particularly true where, as in this case, the employer's stated reasons for firing the whistleblowing employees are dubious.  *See infra* Part III.

The District persists that appellants did not offer any evidence that Director Faust—the person who ultimately decided to terminate them—was aware of appellants' protected conduct.  It is true that an employer's awareness of its

---

[12] After Bishop signed Jones's workers' compensation forms, his supervisor told him "you're going to have to listen to me or they are going to fire you."  He was also told that he was "pissing some people off" after he granted a leave request for Parker, and was informed about a week before his termination that the Warden "wanted to fire him because of [his] interaction with Jones and Parker."  After Johnson signed off on Parker's workers' compensation form, her supervisor informed her that she would get in "trouble" because "nobody be approving no paperwork for Parker and Jones."  When Johnson proceeded to substantiate the claim, her supervisors called her into a meeting, said she "needed to understand the position . . . [she] had undertook as an employee," that she was "expected to be a team player," and that she wasn't being one at the moment, which could "cost" her.

employee's engagement in protected activity is "essential to making out a prima facie case for retaliation." *McFarland*, 935 A.2d at 356. But, again, appellants did not need to produce a smoking gun; it was enough for them to "offer circumstantial evidence that could reasonably support an inference that" Director Faust was aware of their activity. *Bryant*, 102 A.3d at 269 (citing *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009)). They did that by, among other things, adducing evidence that Director Faust indicated any employee who did not "get onboard" with the retaliatory scheme directed at Jones and Parker would be fired; here we have four employees who did not get onboard and were then fired—each on the same day as one of the others, no less. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (evidence showing that complainant was the only employee whose hours were reduced after filing a discrimination complaint was sufficient to infer retaliatory motive).

Our recent decision in *Kolowski* does not point to a different result, as the District argues. In *Kolowski*, the purported whistleblower claimed a jury could infer his employer was aware of his protected disclosure—despite his employer testifying that he was not—because (1) there was an "expectation" that the employer would be kept "apprised of all important issues," and (2) the whistleblower claimed his employer's stated reason for terminating him was a "sham." 244 A.3d at 1014. We

disagreed, explaining that the proffered circumstantial evidence was too speculative because there was no evidence to suggest the employer was actually apprised of important information—or that the whistleblower's protected disclosure was important enough to warrant informing the employer about—and there was no evidence from which a jury could infer that the employer's stated reason for terminating the whistleblower was a sham. *Id.* at 1014-15.

The evidence of Director Faust's knowledge of the protected conduct is much stronger than what we confronted in *Kolowski*. It is not mere conjecture to infer that an employer who threatens to fire employees if they refuse to retaliate against two colleagues, and then fires four employees who refused to do so, was aware of their refusals to comply. And, for the reasons outlined in Part III—unlike in *Kolowski*—there is evidence substantiating that DOC's stated reasons for firing appellants were a "sham." Although the burden of production lay with appellants to present a prima facie case, it is also noteworthy that Director Faust—again, unlike the employer in *Kolowski*—never disclaimed knowledge of appellants' protected conduct.[13]

---

[13] This court has previously recognized that *McFarland*'s "employer awareness" requirement could be limited if an employee established causation based on a "cat's paw" theory of liability. *See Bryant*, 102 A.3d at 268 n.3; *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 418-20 (2011) (recognizing that liability could be found under Title VII where the ultimate decisionmaker was not motivated by discriminatory animus, but a lower-level supervisor was and proximately caused the

**III.**

The existence of a prima facie case does not end the inquiry, however. That is because an employer may rebut a prima facie showing by presenting clear and convincing evidence that the whistleblowing employee's termination "would have occurred for legitimate, independent reasons even if the employee had not engaged in protected activities." *Freeman*, 60 A.3d at 1141 (quoting D.C. Code § 1-615.54(b)); *see Crawford v. District of Columbia*, 891 A.2d 216, 219 (D.C. 2006). The trial court did not reach this issue—believing appellants had not demonstrated a prima facie case—but the District presses it as an alternative basis for affirmance. *See Wilburn*, 957 A.2d at 924 (appellate court may affirm on alternative grounds). Because the argument was preserved below, is fully briefed on appeal, and is heavily intertwined with the factual record already discussed, we exercise our discretion to consider it. The District argues it established, as a matter of law, that appellants were fired for legitimate reasons independent from their protected conduct. We disagree.

---

challenged employment action). Although this theory is arguably available to Johnson, *see infra* Part III.C, she did not raise it. In any event, we need not decide whether a cat's paw causation theory is applicable here given the circumstantial evidence that Director Faust was personally aware of appellants' protected conduct.

## A. James Holbrook and Larry Bishop

According to the District, Holbrook and Bishop were fired on the same day because they "pursued inappropriate personal relationships with female subordinates." But all it offers as substantiation are two form letters stating that Holbrook and Bishop defied orders by engaging or attempting to engage in such relationships. The letters give no specifics—no who, what, when, or where. Nor was any additional information supplied during discovery to fill the informational gap. DOC's Rule 30(b)(6)[14] deponent could only testify as to what the contents of the letters said; she had no knowledge as to the underlying facts or whether any investigation was conducted into the merits of the allegations. An unsubstantiated form letter is hardly clear and convincing evidence.

There are also many reasons to doubt this was the true reason for their firings. For instance, both Holbrook and Bishop denied ever engaging in any inappropriate relationships. That is about as much as they can do to dispute the non-existent details supplied in the two form letters. There is also evidence in the record that Bishop

---

[14] Pursuant to Superior Court Rule of Civil Procedure 30(b)(6), an organization served with a deposition subpoena must "designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf." DOC did not designate Director Faust for this role.

and Holbrook never actually received those form letters as both disclaimed any knowledge of that being the purported reason for their terminations. Indeed, Holbrook and Bishop both stated in appellants' joint complaint that they believed their terminations were the result of an alleged reduction in force. If they are believed, and they were never informed of this ostensible reason for their terminations, that is probably reason enough to doubt that this was an independent and legitimate reason for their terminations. And combined with everything else, we have no doubt that a jury could reject the District's purportedly independent reasons for Holbrook's and Bishop's terminations.

## B. Collins Snow

The District's justification for Snow's dismissal—that he was terminated as a part of a reduction in force—is similarly unsubstantiated. For all we can tell, the reduction in force was limited to the appellants in this case. That does not clearly convince us that Snow's termination was independent of his protected conduct. Enough evidence exists for a jury to find that the District's proffered reason for Snow's termination was a mere pretext.

### C. Sonji Johnson

The evidence is admittedly stronger that there was an independent basis for firing Johnson. The District submitted a memorandum which detailed an incident involving alleged insubordination by Johnson "during an altercation with inmates." This memorandum supplies the necessary specifics that were lacking in Holbrook's and Bishop's letters. It states who was involved, what happened, when it happened, and where it occurred, giving it more legitimacy. Still, there is too much evidence that Johnson was fired for her protected conduct for us to say as a matter of law that Johnson was fired for the seemingly legitimate reasons noted in the memorandum.

In a sworn affidavit, Johnson states she was informed during her exit interview that DOC was letting her "go as part of a reduction in force," and that she did not become aware of the District's now-stated reason for her termination until the deposition of DOC's Rule 30(b)(6) designate. For reasons already explained, we find it significant that Johnson was not informed of the ostensible reason for her termination at the time, but instead was given a different explanation. *See Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1114 (Cal. 2000) ("[E]vidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias."); *Waddell v. Small Tube Prods. Inc.*, 799 F.2d 69, 73 (3d Cir.

1986) (inferring retaliation where employer offered inconsistent reasons for terminating an employee).

Johnson also swore that she could not recall the alleged act of insubordination and questioned the veracity of her supervisor in reporting that the event occurred. That skepticism is not unfounded. The supervisor who claimed to have witnessed Johnson's insubordination (David Holmes) and the supervisor who authored the memorandum detailing her insubordination (Simon Wainwright) had only a few months prior gotten into a dispute with Johnson about her refusal to participate in DOC's retaliation against Jones and Parker, suggesting the memorandum itself may have been retaliatory. DOC's shifting reasons for Johnson's termination, the potential fabrication of the memorandum alleged to be the reason for her termination, and the circumstantial evidence of DOC's retaliatory motive detailed above, are all reasons a jury might reject the legitimacy of DOC's stated reason for Johnson's termination. We thus do not affirm the grant of summary judgment on this alternative ground.

In sum, for us to affirm the trial court's grant of summary judgment based on the District's stated reasons for terminating appellants, we would have to conclude that "any reasonable juror would have to find that the [District] had proven the

legitimacy of its action by 'clear and convincing evidence.'" *Coleman v. United States*, 794 F.3d 49, 60 (D.C. Cir. 2015) (quoting D.C. Code § 1-615.54(b)). The paltry evidence the District marshals as "legitimate reasons" for appellants' terminations, combined with the substantial evidence outlined above that would permit a jury to infer those "legitimate reasons" were mere pretext, convinces us that the District has not cleared this hurdle as to any appellant.

## IV.

We reverse the Superior Court's grant of summary judgment in favor of the District and remand for further proceedings.

*So ordered.*